[No. S029049. Sept. 30, 1993.]

MIRIAM ARATO et al., Plaintiffs and Appellants, v.
MELVIN AVEDON et al., Defendants and Respondents.

---

COUNSEL

Marian Tully for Plaintiffs and Appellants.

Baker, Silberberg & Keener, Marshall Silberg, John C. Kelly, Veatch, Carlson, Grogan & Nelson, C. Snyder Patin, Horvitz & Levy, Frederic D. Cohen and Ari R. Kleiman for Defendants and Respondents.

Catherine I. Hanson and Alice P. Mead as Amici Curiae.

---

OPINION

ARABIAN, J.—A physician's duty to disclose to a patient information material to the decision whether to undergo treatment is the central constituent of the legal doctrine known as "informed consent." In this case, we

review the ruling of a divided Court of Appeal that, in recommending a course of chemotherapy and radiation treatment to a patient suffering from a virulent form of cancer, the treating physicians breached their duty to obtain the patient's informed consent by failing to disclose his statistical life expectancy.

As will appear, we conclude that the Court of Appeal erred in reaching that result. We also conclude that the court erred in holding that an instruction routinely given in informed consent cases fails to convey accurately to the jury the legal standard governing its evaluation of the sufficiency of the disclosures actually made by physician to patient. We hold in addition that the Court of Appeal erred in suggesting, as it appeared to do, that under the doctrine of informed consent, a physician is under a duty to disclose information material to the patient's *nonmedical* interests. Finally, because the propriety of disclosing statistical life expectancy information to a cancer patient depends on the standard of practice within the medical community, we conclude that expert testimony was properly admitted by the trial court for that limited purpose.

## I

### A

Miklos Arato was a successful 42-year-old electrical contractor and part-time real estate developer when, early in 1980, his internist diagnosed a failing kidney. On July 21, 1980, in the course of surgery to remove the kidney, the operating surgeon detected a tumor on the "tail" or distal portion of Mr. Arato's pancreas. After Mrs. Arato gave her consent, portions of the pancreas were resected, or removed, along with the spleen and the diseased kidney. A follow-up pathological examination of the resected pancreatic tissue confirmed a malignancy. Concerned that the cancer could recur and might have infiltrated adjacent organs, Mr. Arato's surgeon referred him to a group of oncology practitioners for follow-up treatment.

During his initial visit to the oncologists, Mr. Arato filled out a multipage questionnaire routinely given new patients. Among the some 150 questions asked was whether patients "wish[ed] to be told the truth about [their] condition" or whether they wanted the physician to "bear the burden" for them. Mr. Arato checked the box indicating that he wished to be told the truth.

The oncologists discussed with Mr. and Mrs. Arato the advisability of a course of chemotherapy known as "F.A.M.," a treatment employing a combination of drugs which, when used in conjunction with radiation therapy,

had shown promise in treating pancreatic cancer in experimental trials. The nature of the discussions between Mr. and Mrs. Arato and the treating physicians, and in particular the scope of the disclosures made to the patient by his doctors, was the subject of conflicting testimony at trial. By their own admission, however, neither the operating surgeon nor the treating oncologists specifically disclosed to the patient or his wife the high statistical mortality rate associated with pancreatic cancer.

Mr. Arato's oncologists determined that a course of F.A.M. chemotherapy was indicated for several reasons. According to their testimony, the high statistical mortality of pancreatic cancer is in part a function of what is by far the most common diagnostic scenario—the discovery of the malignancy well after it has metastasized to distant sites, spreading throughout the patient's body. As noted, in Mr. Arato's case, the tumor was comparatively localized, having been discovered in the tail of the pancreas by chance in the course of surgery to remove the diseased kidney.

Related to the "silent" character of pancreatic cancer is the fact that detection in such an advanced state usually means that the tumor cannot as a practical matter be removed, contributing to the high mortality rate. In Mr. Arato's case, however, the operating surgeon determined that it was possible to excise cleanly the tumorous portion of the pancreas and to leave a margin of about one-half centimeter around the surgical site, a margin that appeared clinically to be clear of cancer cells. Third, the mortality rate is somewhat lower, according to defense testimony, for pancreatic tumors located in the distal part of the organ than for those found in the main body. Finally, then-recent experimental studies on the use of F.A.M. chemotherapy in conjunction with therapeutic radiation treatments had shown promising response rates—on the order of several months of extended life—among pancreatic cancer patients.

Mr. Arato's treating physicians justified not disclosing statistical life expectancy data to their patient on disparate grounds. According to the testimony of his surgeon, Mr. Arato had exhibited great anxiety over his condition, so much so that his surgeon determined that it would have been medically inappropriate to disclose specific mortality rates. The patient's oncologists had a somewhat different explanation. As Dr. Melvin Avedon, his chief oncologist, put it, he believed that cancer patients in Mr. Arato's position "wanted to be told the truth, but did not want a cold shower." Along with the other treating physicians, Dr. Avedon testified that in his opinion, the direct and specific disclosure of extremely high mortality rates for malignancies such as pancreatic cancer might effectively deprive a patient of any hope of cure, a medically inadvisable state. Moreover, all of the treating

physicians testified that statistical life expectancy data had little predictive value when applied to a particular patient with individualized symptoms, medical history, character traits and other variables.

According to the physicians' testimony, Mr. and Mrs. Arato were told at the outset of the treatment that most victims of pancreatic cancer die of the disease, that Mr. Arato was at "serious" or "great" risk of a recurrence and that, should the cancer return, his condition would be judged incurable. This information was given to the patient and his wife in the context of a series of verbal and behavioral cues designed to invite the patient or family member to follow up with more direct and difficult questions. Such follow-up questions, on the order of "how long do I have to live?," would have signaled to his doctors, according to Dr. Avedon's testimony, the patient's desire and ability to confront the fact of imminent mortality. In the judgment of his chief oncologist, Mr. Arato, although keenly interested in the clinical significance of the most minute symptom, studiously avoided confronting these ultimate issues; according to his doctors, neither Mr. Arato nor his wife ever asked for information concerning his life expectancy in more than 70 visits over a period of a year. Believing that they had disclosed information sufficient to enable him to make an informed decision whether to undergo chemotherapy, Mr. Arato's doctors concluded that their patient had as much information regarding his condition and prognosis as he wished.

Dr. Avedon also testified that he told Mr. Arato that the effectiveness of F.A.M. therapy was unproven in cases such as his, described its principal adverse side effects, and noted that one of the patient's options was not to undergo the treatment. In the event, Mr. Arato consented to the proposed course of chemotherapy and radiation, treatments that are prolonged, difficult and painful for cancer patients. Unfortunately, the treatment proved ineffective in arresting the spread of the malignancy. Although clinical tests showed him to be free of cancer in the several months following the beginning of the F.A.M. treatments, beginning in late March and into April of 1981, the clinical signs took an adverse turn.[1] By late April, the doctors were convinced by the results of additional tests that the cancer had returned and was spreading. They advised the patient of their suspicions and discontinued chemotherapy. On July 25, 1981, a year and four days following surgery, Mr. Arato succumbed to the effects of pancreatic cancer.

---

[1] Around this time—on March 12, 1981, according to the record—an article appeared in the Los Angeles Times stating that only 1 percent of males and 2 percent of females diagnosed as having pancreatic cancer live for five years. According to his wife's testimony, Mr. Arato read the Times article and brought it to the attention of his oncologists. One of his oncologists confirmed such a discussion but denied that he told Mr. Arato that the statistics did not apply to his case, as Mrs. Arato testified. Mr. Arato continued to undergo chemotherapy treatment after reading the article and evidently made no changes in his estate planning or business and real estate affairs.

B

Not long after his death, Mr. Arato's wife and two children brought this suit against the physicians who had treated their husband and father in his last days, including the surgeon who performed the pancreas resection and the oncologists who had recommended and administered the chemotherapy/radiation treatment. As presented to the jury,[2] the gist of the lawsuit was the claim that in discussing with their patient the advisability of undergoing a course of chemotherapy and radiation, Mr. Arato's doctors had failed to disclose adequately the shortcomings of the proposed treatment in light of the diagnosis, and thus had failed to obtain the patient's informed consent. Specifically, plaintiffs contended that the doctors were aware that, because early detection is difficult and rare, pancreatic cancer is an especially virulent malignancy, one in which only 5 to 10 percent of those afflicted live for as long as five years, and that given the practically incurable nature of the disease, there was little chance Mr. Arato would live more than a short while, even if the proposed treatment proved effective.

Such mortality information, the complaint alleged—especially the statistical morbidity rate of pancreatic cancer—was material to Mr. Arato's decision whether to undergo postoperative treatment; had he known the bleak truth concerning his life expectancy, he would not have undergone the rigors of an unproven therapy, but would have chosen to live out his last days at peace with his wife and children, and arranging his business affairs. Instead, the complaint asserted, in the false hope that radiation and chemotherapy treatments could effect a cure—a hope born of the negligent failure of his physicians to disclose the probability of an early death—Mr. Arato failed to order his affairs in contemplation of his death, an omission that, according to the complaint, led eventually to the failure of his contracting business and to substantial real estate and tax losses following his death.

As the trial neared its conclusion and the court prepared to charge the jury, plaintiffs requested that several special instructions be given relating to the nature and scope of the physician's duty of disclosure. Two proffered instructions in particular are pertinent to this appeal. In the first, plaintiffs asked the trial court to instruct the jury that "A physician has a fiduciary duty to a patient to make a full and fair disclosure to the patient of all facts which materially affect the patient's rights and interests." The second instruction sought by plaintiffs stated that "The scope of the physician's duty

---

[2]Prior to submission of the case to the jury, plaintiffs voluntarily dismissed a cause of action for wrongful death; the trial court subsequently dismissed three additional claims for negligent infliction of emotional distress, willful and wanton misconduct, and fraud and deceit, leaving only the negligence claim for the jury's consideration.

to disclose is measured by the amount of knowledge a patient needs in order to make an informed choice. All information material to the patient's decision should be given."

The trial judge declined to give the jury either of the two instructions sought by plaintiffs. Instead, the court read to the jury a modified version of BAJI No. 6.11, the so-called "reality of consent" instruction drawn from our opinion in *Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1]. As can be seen by a comparison of the two instructions, the texts of which are set out in the margin,[3] the instruction actually given the jury by the trial court substantially recapitulated the wording of BAJI No. 6.11,

---

[3]BAJI No. 6.11 (7th ed. 1986 bound vol.) reads: "Except as hereinafter explained, it is the duty of the physician to disclose to the patient all material information to enable the patient to make an informed decision regarding the proposed operation or treatment. [¶] Material information is information which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject a recommended medical procedure. To be material a fact must also be one which is not commonly appreciated. [¶] There is no duty to make disclosure of risks when the patient requests that he or she not be so informed or where the procedure is simple and the danger remote and commonly understood to be remote. [¶] Likewise, there is no duty to discuss minor risks inherent in common procedures, when such procedures very seldom result in serious ill effects. [¶] However, when a procedure inherently involves a known risk of death or serious bodily harm it is the physician's duty to disclose to the patient the possibility of such outcome and to explain in lay terms the complications that might possibly occur. The physician or surgeon must also disclose such additional information as a skilled practitioner of good standing would provide under the same or similar circumstances. [¶] A physician has no duty of disclosure beyond that required of physicians of good standing in the same or similar locality when he or she relied upon facts which would demonstrate to a reasonable person that the disclosure would so seriously upset the patient that the patient would not have been able to rationally weigh the risks of refusing to undergo the recommended [treatment] [operation]. [¶] Even though the patient has consented to a proposed treatment or operation, the failure of the physician to inform the patient as stated in this instruction before obtaining such consent is negligence and renders the physician subject to liability for any injury [proximately] [legally] resulting from the [treatment] [operation] if a reasonably prudent person in the patient's position would not have consented to the [treatment] [operation] if he or she had been adequately informed of all the significant perils."

The trial judge read to the jury the following instruction: "Except as hereinafter explained, it is the duty of the physician to disclose to the patient all material information to enable the patient to make an informed decision regarding proposed treatment. [¶] Material information is information which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject a recommended medical procedure. To be material a fact must also be one which is not commonly appreciated. [¶] A physician has no duty of disclosure beyond that required of physicians of good standing in the same or similar locality when he or she relied upon facts which would demonstrate to a reasonable person that the disclosure would so seriously upset the patient that the patient would not have been able to rationally weigh the risks of refusing to undergo the recommended treatment. [¶] Even though the patient has consented to a proposed treatment or operation, the failure of the physician to inform the patient as stated in this instruction before obtaining such consent is negligence and renders the physician subject to liability for any damage legally resulting from the failure to disclose or for any injury legally

except for the omission of two brief paragraphs dealing with exceptions to the duty of disclosure and a third paragraph that appears on its face not to have been relevant to the case as it developed at trial.

In addition to the modified version of BAJI No. 6.11, the trial court supplemented its informed consent instructions to the jury with the three special instructions, two requested by plaintiffs and a third offered by defendants, set out below.[4] Finally, with plaintiffs' approval, the trial court gave the jury several generic BAJI instructions dealing with such topics as the general legal duties of physicians and specialists (BAJI Nos. 6.00 & 6.11), the negligence standard of care in medical cases (BAJI Nos. 6.02 & 6.30) and when patient consent is necessary (BAJI No. 6.10).

After concluding its deliberations, the jury returned two special verdicts —on a form approved by plaintiffs' counsel—finding that none of the defendants was negligent in the "medical management" of Mr. Arato, and that defendants "disclosed to Mr. Arato all relevant information which would have enabled him to make an informed decision regarding the proposed treatment to be rendered him." Plaintiffs appealed from the judgment entered on the defense verdict, contending that the trial court erred in refusing to give the jury the special instructions requested by them. As noted, a divided Court of Appeal reversed the judgment of the trial court, and ordered a new trial. We granted defendants' ensuing petition for review and now reverse the judgment of the Court of Appeal.

## C

In the Court of Appeal's view, Mr. Arato's doctors had breached the duty to disclose to their patient information material to the decision whether to undergo the radiation and drug therapy. According to the Court of Appeal, because there are so many different cancers, the lethality of which varies dramatically, telling a patient that cancer might recur and would then be

---

resulting from the treatment if a reasonably prudent person in the patient's position would not have consented to the treatment if he or she had been adequately informed of the likelihood of his [sic] premature death."

[4]As modified, the following two instructions requested by plaintiffs were read to the jury:

"The law recognizes that patients are generally persons unlearned in the medical sciences and that the knowledge of the patient and physician are not in parity."

"The law recognizes that a person of adult years and in sound mind has the right, in the exercise of control over his own body, to determine whether or not to submit to lawful medical treatment."

The following instruction, as modified by the trial court, was given at defendants' request:

"The doctrine of informed consent imposes upon a physician a duty to disclose relevant information concerning a proposed treatment. However, the doctrine recognizes that the primary duty of a physician is to do what is best for his patient."

incurable, without providing at least some general information concerning the virulence of the particular cancer at issue as reflected in mortality tables, was "meaningless." In addition, the Court of Appeal reasoned that his physicians were under a duty to disclose numerical life expectancy information to Mr. Arato so that he and his wife might take timely measures to minimize or avoid the risks of financial loss resulting from his death.

The Court of Appeal also concluded that the instructions concerning the physicians' duty of disclosure given the jury by the trial judge were defective in two respects. First, one paragraph of BAJI No. 6.11 improperly emphasized a physician's defense to a failure-to-disclose claim as well as the importance of community medical standards in measuring the adequacy of the disclosures. These defects would have been mitigated by giving the jury plaintiffs' requested instructions, the court reasoned.

In addition, the Court of Appeal concluded that the instruction, given at the request of the defendants, to the effect that the primary duty of a physician is "to do what is best for his patient," operated to mislead the jury into believing that a physician's duty of disclosure may be limited by his or her own opinion as to what is in the patient's best interests. The Court of Appeal also concluded that the jury was misled as to the governing legal standard by the fact that the specific disclosure instructions modeled on BAJI No. 6.11 were preceded by other, lengthy instructions from BAJI (BAJI Nos. 6.00, 6.01, 6.02, 6.03, 6.30 [7th ed. 1986 bound vol.]) dealing with the general standard of care for medical professionals in negligence actions —an ordering that, the court reasoned, compounded the skewed impression already conveyed to the jury regarding the significance of community medical standards in informed consent cases.

Finally, the Court of Appeal concluded that the trial court had erred in permitting defendants to introduce the testimony of expert medical witnesses. Although conceding that expert testimony is appropriate where the physician's defense rests on the so-called "therapeutic exception" (e.g., that the patient was emotionally incapable of making a rational decision concerning a proposed treatment), the court reasoned that the expert defense testimony permitted by the trial court went well beyond that narrow exception to the duty of disclosure, misleading the jury in their deliberations regarding the significance of community medical practice and prejudicing plaintiffs' case.

## II

### A

The fount of the doctrine of informed consent in California is our decision of some 20 years ago in *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, an opinion by

a unanimous court that built on several out-of-state decisions significantly broadening the scope and character of the physician's duty of disclosure in obtaining the patient's consent to treatment.[5] In *Cobbs* v. *Grant*, we not only anchored much of the doctrine of informed consent in a theory of negligence liability, but also laid down four "postulates" as the foundation on which the physician's duty of disclosure rests.

"The first [of these postulates,]" we wrote, "is that patients are generally persons unlearned in the medical sciences and therefore, except in rare cases, courts may safely assume the knowledge of patient and physician are not in parity. The second is that a person of adult years and in sound mind has the right, in the exercise of control over his own body, to determine whether or not to submit to lawful medical treatment." (8 Cal.3d at p. 242.)

"The third [postulate,]" we continued, "is that the patient's consent to treatment, to be effective, must be an informed consent. And the fourth is that the patient, being unlearned in medical sciences, has an abject dependence upon and trust in his physician for the information upon which he relies during the decisional process, thus raising an obligation in the physician that transcends arms-length transactions." (8 Cal.3d at p. 242.) From these ethical imperatives, we derived the obligation of a treating physician "of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each." (8 Cal.3d at p. 243.)

Since *Cobbs* v. *Grant, supra*, 8 Cal.3d 229, was decided, we have revisited the doctrine of informed consent. In *Truman* v. *Thomas* (1980) 27 Cal.3d 285 [165 Cal.Rptr. 308, 611 P.2d 902], we held that the physician's duty of due care embraced disclosure of the material risks resulting from the patient's *refusal* to consent to a recommended treatment—in that case, a routine annual pap smear. In concluding that the trial court had erred reversibly in refusing to instruct the jury on the physician's duty of disclosure, we said that the doctrine of informed consent recognized in *Cobbs* v. *Grant, supra*, 8 Cal.3d 229, was imposed "so that patients might meaningfully exercise their right to make decisions about their own bodies." (*Truman* v. *Thomas, supra*, at p. 292.)

---

[5]Influential contemporaneous decisions of other courts include *Canterbury* v. *Spence* (D.C. Cir. 1972) 464 F.2d 772 and *Natanson* v. *Kline* (1960) 186 Kan. 393 [350 P.2d 1093], as well as the much earlier but still powerful opinion by Judge Cardozo in *Schloendorff* v. *Society of New York Hospital* (1914) 211 N.Y. 125 [105 N.E. 92]. The origin of the phrase "informed consent" is often attributed to the opinion by Justice Bray in *Salgo* v. *Leland Stanford etc. Bd. Trustees* (1957) 154 Cal.App.2d 560, 578 [317 P.2d 170] (*Salgo*). (See, e.g., Katz, *Informed Consent—A Fairy Tale? Law's Vision* (1977) 39 U.Pitt.L.Rev. 137.) We recently traced the origin and development of the doctrine in American law in *Thor* v. *Superior Court* (1993) 5 Cal.4th 725 [21 Cal.Rptr.2d 357, 855 P.2d 375].

Our opinion also stressed the paramount role of the trier of fact in informed consent cases. We recognized, for example, that questions such as whether the danger posed by a failure to disclose a particular risk is remote, whether the risk was or was not commonly known, and whether circumstances unique to a given case supported a duty of disclosure were matters for the jury to decide. We accordingly declined to hold that as a matter of law the physician owed no duty to make a given disclosure to the patient. That question, we concluded, was one for the jury to decide. (*Truman v. Thomas, supra,* 27 Cal.3d at pp. 293-294.)

We recently returned to the scope of a physician's duty of disclosure in *Moore* v. *Regents of University of California* (1990) 51 Cal.3d 120 [271 Cal.Rptr. 146, 793 P.2d 479, A.L.R.4th 3659] (*Moore*). Although the chief focus of *Moore* was whether the nonconsensual use of human cells in medical research supported a patient's action seeking to impose on health professionals liability for conversion, our opinion reaffirmed the "well-established principles" enunciated in *Cobbs* v. *Grant, supra,* 8 Cal.3d 229. (51 Cal.3d at p. 129.) It was on that foundation that we held "a physician must disclose personal interests unrelated to the patient's health, whether research or economic, that may affect the physician's personal judgment . . . ." (*Ibid.*)

B

Together with companion decisions in other jurisdictions, *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, is one of the epochal opinions in the legal recognition of the medical patient's protectible interest in autonomous decisionmaking. After more than a generation of experience with the judicially broadened duty of physician disclosure, the accumulated medicolegal comment on the subject of informed consent is both large and discordant. Those critics writing under the banner of "patient autonomy" insist that the practical administration of the doctrine has been thwarted by a failure of judicial nerve and an unremitting hostility to its underlying spirit by the medical profession. Others, equally earnest, assert that the doctrine misapprehends the realities of patient care and enshrines moral ideals in the place of workable rules.[6]

Despite the critical standoff between these extremes of "patient sovereignty" and "medical paternalism," indications are that the *Cobbs*-era

---

[6]A representative sampling of scholarly comment on the rise of the doctrine of informed consent and its current status would include the work of Professor Jay Katz. (See, e.g., Katz, *Informed Consent—A Fairy Tale? Law's Vision, supra,* 39 U.Pitt.L.Rev. 137; Katz, The Silent World of Doctor and Patient (1984).) Professor Katz served as a consultant to the Presidential Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research (Presidential Commission) and its ensuing three-volume report entitled, Making Health Care Decisions, The Ethical and Legal Implications of Informed Consent in the

decisions helped effect a revolution in attitudes among patients and physicians alike regarding the desirability of frank and open disclosure of relevant medical information.[7] The principal question we must address is whether our holding in *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, as embodied in BAJI No. 6.11, accurately conveys to juries the legal standard under which they assess the evidence in determining the adequacy of the disclosures made by physician to patient in a particular case or whether, as the Court of Appeal here appeared to conclude, the standard instruction should be revised to mandate specific disclosures such as patient life expectancy as revealed by mortality statistics.

In our view, one of the merits of the somewhat abstract formulation of BAJI No. 6.11 is its recognition of the importance of the overall medical context that juries ought to take into account in deciding whether a challenged disclosure was reasonably sufficient to convey to the patient information material to an informed treatment decision. The contexts and clinical settings in which physician and patient interact and exchange information material to therapeutic decisions are so multifarious, the informational needs and degree of dependency of individual patients so various, and the professional relationship itself such an intimate and irreducibly judgment-laden one, that we believe it is unwise to require *as a matter of law* that a particular species of information be disclosed. ▪ We agree with the insight in *Salgo, supra,* 154 Cal.App.2d at page 578, that in administering the doctrine of informed consent, "each patient presents a separate problem, that the patient's mental and emotional condition is important and in certain cases may be crucial, and that in discussing the element of risk a certain amount of discretion must be employed consistent with the full disclosure of facts necessary to an informed consent."

Our opinion in *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, recognized these "common practicalities" of medical treatment which, we said, make the ideal

Patient-Practitioner Relationship (1982) (Making Health Care Decisions). (Other studies and comments of note are Shultz, *From Informed Consent to Patient Choice: A New Protected Interest* (1985) 95 Yale L.J. 219; Meisel, *The "Exceptions" to the Informed Consent Doctrine: Striking a Balance Between Competing Values in Medical Decisionmaking,* 1979 Wis.L.Rev. 413; Waltz & Scheuneman, *Informed Consent to Therapy* (1969-1970) 64 Nw.U.L.Rev. 628; Weisbard, *Informed Consent: The Law's Uneasy Compromise With Ethical Theory* (1986) 65 Neb.L.Rev. 749; Fajfar, *An Economic Analysis of Informed Consent to Medical Care* (1991-1992) 80 Geo.L.J. 1941; Note, *Informed Consent in Medical Malpractice* (1967) 55 Cal.L.Rev. 1396; and the symposium, *Jay Katz, Authority and Autonomy, Power and Process in Medical Research and Practice, in the Family, and in Society* (1988) 16 Law, Medicine & Health Care 153.)

[7]According to the report of the Presidential Commission (see, *ante,* fn. 6), a survey conducted in 1961 by the Journal of the American Medical Association found that 90 percent of physicians preferred not to inform patients of a diagnosis of cancer; in a follow-up study conducted in 1977, 97 percent of the physicians surveyed said they routinely disclosed cancer diagnoses to patients. (1 Making Health Care Decisions, *supra,* p. 76, fn. 14.)

of "full disclosure" a "facile expression[ ]." (*Id.* at p. 244.) Eschewing both a "minicourse in medical science" and a duty to discuss "the relatively minor risks inherent in common procedures," we identified the touchstone of the physician's duty of disclosure in the patient's need for "adequate information to enable an intelligent choice," a peculiarly fact-bound assessment which juries are especially well-suited to make. (*Id.* at pp. 244-245.)

This sensitivity to context seems all the more appropriate in the case of life expectancy projections for cancer patients based on statistical samples. Without exception, the testimony of every physician-witness at trial confirmed what is evident even to a nonprofessional: statistical morbidity values derived from the experience of population groups are inherently unreliable and offer little assurance regarding the fate of the individual patient; indeed, to assume that such data are conclusive in themselves smacks of a refusal to explore treatment alternatives and the medical abdication of the patient's well-being. Certainly the jury here heard evidence of articulable grounds for the conclusion that the particular features of Mr. Arato's case distinguished it from the typical population of pancreatic cancer sufferers and their dismal statistical probabilities—a fact plaintiffs impliedly acknowledged at trial in conceding that the oncologic referral of Mr. Arato and ensuing chemotherapy were not in themselves medically negligent.

In declining to endorse the mandatory disclosure of life expectancy probabilities, we do not mean to signal a retreat from the patient-based standard of disclosure explicitly adopted in *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, 243. We reaffirm the view taken in *Cobbs* that, because the "weighing of these risks [i.e., those inherent in a proposed procedure] against the individual subjective fears and hopes of the patient is not an expert skill," the test "for determining whether a potential peril must be divulged is its materiality to the patient's decision." (*Id.* at pp. 243, 245.) In reaffirming the appropriateness of that standard, we can conceive of no trier of fact more suitable than lay jurors to pronounce judgment on those uniquely human and necessarily situational ingredients that contribute to a specific doctor-patient exchange of information relevant to treatment decisions; certainly this is not territory in which appellate courts can usefully issue "bright line" guides.

Rather than mandate the disclosure of specific information as a matter of law, the better rule is to instruct the jury that a physician is under a legal duty to disclose to the patient all material information—that is, "information which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject a recommended medical procedure"—needed to make an informed decision regarding a proposed treatment. That, of course, is the formulation

embodied in BAJI No. 6.11 and the instruction given in this case. Having been properly instructed, the jury returned a defense verdict—on a form approved by plaintiffs' counsel—specifically finding that defendants had "disclosed to Mr. Arato all relevant information which would have enabled him to make an informed decision regarding the proposed treatment to be rendered him."

We decline to intrude further, either on the subtleties of the physician-patient relationship or in the resolution of claims that the physician's duty of disclosure was breached, by requiring the disclosure of information that may or may not be indicated in a given treatment context. Instead, we leave the ultimate judgment as to the factual adequacy of a challenged disclosure to the venerable American jury, operating under legal instructions such as those given here and subject to the persuasive force of trial advocacy.

Here, the evidence was more than sufficient to support the jury's finding that defendants had reasonably disclosed to Mr. Arato information material to his decision whether to undergo the proposed chemotherapy/radiation treatment. There was testimony that Mr. and Mrs. Arato were informed that cancer of the pancreas is usually fatal; of the substantial risk of recurrence, an event that would mean his illness was incurable; of the unproven nature of the F.A.M. treatments and their principal side effects; and of the option of forgoing such treatments. Mr. Arato's doctors also testified that they could not with confidence predict how long the patient might live, notwithstanding statistical mortality tables.

In addition, the jury heard testimony regarding the patient's apparent avoidance of issues bearing upon mortality; Mrs. Arato's testimony that his physicians had assured her husband that he was "clear" of cancer; and the couple's common expectation that he had been "cured," only to learn, suddenly and unexpectedly, that the case was hopeless and life measurable in weeks. The informed consent instructions given the jury to assess this evidence were an accurate statement of the law, and the Court of Appeal in effect invaded the province of the trier of fact in overturning a fairly litigated verdict.[8]

---

[8]Despite their claim that life expectancy information is material to a patient's treatment decision and therefore should have been disclosed to Mr. Arato, plaintiffs did not seek an instruction to that specific effect. As noted, the version of BAJI No. 6.11 that was given by the trial court instructed the jury that the duty of disclosure encompassed "information which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject a recommended medical procedure," a formulation adequate on its face to permit a jury to decide that, as plaintiffs' contend, life expectancy information should have been disclosed to Mr. Arato. Nowhere do plaintiffs

## C

In addition to their claim that his physicians were required to disclose statistical life expectancy data to Mr. Arato to enable him to reach an informed treatment decision, plaintiffs also contend that defendants should have disclosed such data because it was material to the patient's *nonmedical* interests, that is, Mr. Arato's business and investment affairs and the potential adverse impact of his death upon them. In support of this proposition, plaintiffs rely on the following statement in *Bowman* v. *McPheeters* (1947) 77 Cal.App.2d 795, 800 [176 P.2d 745]: "As fiduciaries it was the duty of defendants [physicians] to make a full and fair disclosure to plaintiff of all facts which materially affected his rights and interests." Plaintiffs contend that since Mr. Arato's contracting and real estate affairs would suffer if he failed to make timely changes in estate planning in contemplation of imminent death, and since these matters are among "his rights and interests," his physicians were under a legal duty to disclose all material facts that might affect them, including statistical life expectancy information. We reject the claim as one founded on a premise that is not recognized in California.

The short answer to plaintiffs' claim is our statement in *Moore, supra,* 51 Cal.3d 120, that a "physician is not the patient's financial adviser." (*Id.* at p. 131, fn. 10.) From its inception, the rationale behind the disclosure requirement implementing the doctrine of informed consent has been to protect the patient's freedom to "exercise . . . control over [one's] own body" by directing the course of *medical treatment.* (*Cobbs* v. *Grant, supra,* 8 Cal.3d at p. 242.) We recently noted that "the principle of self-determination . . . embraces all aspects of medical decisionmaking by the competent adult . . . ." (*Thor* v. *Superior Court, supra,* 5 Cal.4th 725, 738.) Although an aspect of personal autonomy, the conditions for the exercise of the patient's right of self-decision presuppose a therapeutic focus, a supposition reflected in the text of BAJI No. 6.11 itself.[9] The fact that a physician has "fiducial" obligations (*Cobbs* v. *Grant, supra,* 8 Cal.3d at p. 246) which, as the result in

even attempt to demonstrate that their proposed special instructions (set out, *ante,* at pp. 1179-1180) would have conveyed the principle of materiality better than the instruction actually given. Rather than focus on this fatal defect in plaintiffs' theory of error and resulting prejudice, the Court of Appeal discussed the general question of the scope of a physician's duty of disclosure.

[9]Compare, e.g., the opening paragraphs of the standard instruction: ". . . it is the duty of the physician to disclose to the patient all material information to enable the patient to make an informed decision regarding the proposed *operation* or *treatment.* [¶] Material information is information which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject a recommended *medical procedure.* . . ." (BAJI No. 6.11, italics added.) The text of the instruction, of course, is derived from our opinions in *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, and *Truman* v. *Thomas, supra,* 27 Cal.3d 285, both of which make clear the therapeutic "trigger" required to

*Bowman* illustrates, prohibit misrepresenting the nature of the patient's medical condition, does not mean that he or she is under a duty, the scope of which is undefined, to disclose every contingency that might affect the patient's *nonmedical* "rights and interests."[10] Because plaintiffs' open-ended proposed instruction—that the physician's duty embraces the "disclosure . . . of all facts which materially affect the patient's rights and interests"—failed to reflect the therapeutic limitation inherent in the doctrine of informed consent, it would have been error for the trial judge to give it to the jury.[11]

Finally, plaintiffs make much of the fact that in his initial visit to Dr. Avedon's office, Mr. Arato indicated in a lengthy form he was requested to complete that he "wish[ed] to be told the truth about [his] condition." In effect, they contend that as a result of Mr. Arato's affirmative answer, defendants had an absolute duty to make specific life expectancy disclosures to him. Whether the patient has filled out a questionnaire indicating that he or she wishes to be told the "truth" about his of her condition or not, however, a physician is under a legal duty to obtain the patient's informed consent to any recommended treatment. Although a patient may validly waive the right to be informed, we do not see how a request to be told the "truth" in itself heightens the duty of disclosure imposed on physicians as a matter of law.

---

invoke the duty of disclosure. (See, e.g., 8 Cal.3d at pp. 243-246; 27 Cal.3d at pp. 291-292; cf. *Vandi* v. *Permanente Medical Group, Inc.* (1992) 7 Cal.App.4th 1064, 1069-1070 [9 Cal.Rptr.2d 463].)

[10]Understood in context, we have no quarrel with the accuracy of the statement in *Bowman* v. *McPheeters, supra,* 77 Cal.App.2d 795, on which plaintiffs rely. The plaintiff there consulted the defendant doctors to remove a steel splinter lodged in his arm. In the course of radiation treatments, plaintiff's arm was negligently burned. During repeated consultations, plaintiff was told he was suffering from "steel poisoning" and would soon recover. Eventually, he saw another doctor, who diagnosed radiation-induced cancer. In the ensuing malpractice action, the original physicians defended on the ground that the statute of limitations had run on plaintiff's claim.

The court held that the limitations defense failed because it was founded on the fraudulent concealment of the nature of plaintiff's condition. It was in that connection that the court made the statement on which plaintiffs rely. In context, it is clear that the statement in *Bowman* meant that a physician who had misrepresented to the patient the nature of a medical condition could not later take advantage of that misrepresentation to claim the benefit of the statute of limitations. Plaintiffs thus make far too much of casual language appearing in a case decided a quarter century before our opinion in *Cobbs* v. *Grant* and in a context that did not deal with issues of informed consent.

[11]Plaintiffs' other proposed special instruction—to the effect that the scope of the physician's disclosure should embrace all information material to the patient's decision (see, *ante,* at pp. 1179-1180)—while an accurate statement of the law, was substantially incorporated into the modified version of BAJI No. 6.11 read to the jury. (See, *ante,* at pp. 1180-1181, fns. 3 & 4.) It is not error, of course, to refuse to give an instruction requested by a party when the legal point is covered adequately by the instructions that are given. (See, e.g., *Mathis* v. *Morrissey* (1992) 11 Cal.App.4th 332, 343 [13 Cal.Rptr.2d 819].)

## III

■ The final issue we must resolve concerns the use of expert testimony at trial. As noted, the Court of Appeal concluded that expert testimony offered on behalf of defendants went beyond what was appropriate in support of the so-called "therapeutic exception" to the physician's duty of disclosure, misleading the jury and prejudicing plaintiffs' case. Resolution of this issue requires an understanding of the proper, albeit limited, role of expert testimony in informed consent cases.

Over plaintiffs' objection, the trial court admitted the testimony of two medical experts, Drs. Plotkin and Wellisch, the former a professor of clinical medicine and the latter an expert in the psychological management of cancer patients. Both testified that the standard of medical practice cautioned against disclosing to pancreatic cancer patients specific life expectancy data unless the patient directly requested such information and that, in effect, defendants complied with that standard in not disclosing such information to Mr. Arato under the circumstances. Plaintiffs offered expert medical testimony of their own to counter this evidence; their expert testified that there are a number of indirect and compassionate ways to approach the issue of imminent mortality in dealing with patients with terminal cancer and that the standard of professional practice required that a patient in Mr. Arato's circumstances be given specific numerical life expectancy information.

Plaintiffs now complain that it was error for the trial court to admit expert defense testimony, relying on our statement in *Cobbs* v. *Grant, supra,* 8 Cal.3d at page 243, that the weighing of the risks accompanying a given therapy "against the individual subjective fears and hopes of the patient is not an expert skill." Plaintiffs fail to distinguish between the two kinds of physician disclosure discussed in *Cobbs.* Our formulation of the scope of the duty of disclosure encompassed "the potential of death or serious harm" known to be inherent in a given procedure and an explanation "in lay terms [of] the complications that might possibly occur." (*Id.,* at p. 244.) In addition to these disclosures, which we termed the "minimal" ones required of a physician to insure the patient's informed decisionmaking, we said that the physician must also reveal to the patient "such additional information as a skilled practitioner of good standing would provide under similar circumstances." (*Id.* at pp. 244-245.)

As its verbatim presence in BAJI No. 6.11 testifies, the quoted language, including the reference to the standard of professional practice as the benchmark for measuring the scope of disclosure beyond that implicated by the risks of death or serious harm and the potential for complications, has

become an integral part of the legal standard in California for measuring the adequacy of a physician's disclosure in informed consent cases. (See, e.g., *Vandi* v. *Permanente Medical Group. Inc., supra,* 7 Cal.App.4th 1064, 1071; *Mathis* v. *Morrissey, supra,* 11 Cal.App.4th 332, 344; *Morgenroth* v. *Pacific Medical Center, Inc.* (1976) 54 Cal.App.3d 521, 534-535 [126 Cal.Rptr. 681].)

In reckoning the scope of disclosure, the physician will for the most part be guided by the patient's decisional needs—or, as we said in *Cobbs* v. *Grant, supra,* "the test for determining whether a potential peril must be divulged is its materiality to the patient's decision." (8 Cal.3d at p. 245.) A physician, however, evaluates the patient's decisional needs against a background of professional understanding that includes a knowledge of what information beyond the significant risks associated with a given treatment would be regarded by the medical community as appropriate for disclosure under the circumstances.

It is thus evident that under the formulation we adopted in *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, situations will sometimes arise in which the trier of fact is unable to decide the ultimate issue of the adequacy of a particular disclosure without an understanding of the standard of practice within the relevant medical community. For that reason, in an appropriate case, the testimony of medical experts qualified to offer an opinion regarding what, if any, disclosures—in addition to those relating to *the risk of death or serious injury and significant potential complications posed by consenting to or declining a proposed treatment*—would be made to the patient by a skilled practitioner in the relevant medical community under the circumstances, is relevant and admissible.

We underline the limited and essentially subsidiary role of expert testimony in informed consent litigation. As we cautioned in *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, a rule that filters the scope of patient disclosure entirely through the standards of the medical community " 'arrogate[s] the decision [of what to disclose] . . . to the physician alone.' " (*Id.* at p. 243.) We explicitly rejected such an absolute rule as inimical to the rationale and objectives of the informed consent doctrine; we reaffirm that position. Nevertheless, as explained above, there may be a limited number of occasions in the trial of informed consent claims where the adequacy of disclosure in a given case may turn on the standard of practice within the relevant medical community. In such instances, expert testimony will usually be appropriate.

Because statistical life expectancy data is information that lies outside the significant risks associated with a given treatment, the disclosure of which is

mandated by *Cobbs* v. *Grant, supra,* 8 Cal.3d 229, it falls within the scope of the "additional information . . . a skilled practitioner . . . would provide . . . ." (*Id.* at pp. 244-245.) And since the question of whether a physician should disclose such information turns on the standard of practice within the medical community, the trial court did not err in permitting expert testimony directed at that issue.

 Finally, plaintiffs complain that a statement included in a special instruction given at defendants' request—that "the primary duty of a physician is to do what is best for his patient"—was reversible error. We disagree. Although the challenged language is clearly a misstatement of governing law and should not have been given by the trial court, it is unlikely that these dozen or so words, appearing late in the mass of instructions, could have operated to mislead the jurors into believing that Mr. Arato's doctors were legally free to tell him as much or as little as they wished. ■ Although it was error to read to the jury defendants' special instruction as drafted, it was not prejudicial under the circumstances.[12]

## Conclusion

The judgment of the Court of Appeal is reversed and the cause is remanded with directions to affirm the judgment of the trial court.

Lucas, C. J., Mosk, J., Panelli, J., Kennard, J., Baxter, J., and George, J., concurred.

---

[12]We also reject the Court of Appeal's conclusion that because the informed consent instructions were preceded by "generic" instructions from the BAJI series relating to the standards governing ordinary medical negligence (BAJI Nos. 6.00, 6.01, 6.02, 6.03, 6.30 [7th ed. 1986 bound vol.]), the jury deliberated under an enlarged and misleading impression of the value of expert testimony in deciding the informed consent issue. The general BAJI medical negligence instructions were appropriate in light of plaintiffs' alternative theory of liability, referred to as "negligent medical mismanagement" by their trial counsel; counsel contended that plaintiffs' alternative theory was subject to the ordinary standard of medical negligence and approved giving the jury the appropriate BAJI instructions. Any error on this score was invited.