**Mary L. HANNA and Cleveland B. Hanna, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. CIV S–89–1507 PAN.

United States District Court,
E.D. California.

Dec. 1, 1993.

Rand L. Stephens, Antioch, CA, for plaintiff at trial.

Assistant U.S. Attys. Solomon Robinson and Elizabeth Price, Sacramento, CA, for the U.S.     .

## MEMORANDUM OF DECISION

NOWINSKI, United States Magistrate Judge.

In this case, a 43 year old widow seeks recovery for injuries sustained during an operation. Plaintiff Mary Hanna suffered from recurrent infection of the saliva or "parotid" gland. After several years of treatment, including a partial parotidectomy in 1987, plaintiff underwent a complete parotidectomy in 1988. During the 1988 surgery, plaintiff's left facial nerve was severed and the left side of plaintiff's face was permanently paralysed as a result.

On November 1, 1989, plaintiff brought suit against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671 et seq., claiming that defendant had failed to obtain her informed consent to the operation.

This matter came before the court for trial on October 5, 1993, pursuant to 28 U.S.C. § 636(c)(1). Rand L. Stephens of Antioch appeared for plaintiff Mary Hanna and U.S. Attorney Solomon Robinson and Assistant U.S. Attorney Elizabeth Price, of Sacramento, appeared on behalf of defendant.

The undisputed facts are as follows. For a substantial time before June 23, 1987, plaintiff Mary Hanna, a dependent spouse of Cleveland Hanna, a United States Air Force non-commissioned officer stationed at Travis Air Force Base, California ("Travis"), suffered from chronic blockage and concomitant infection of the left salivary gland. Treatment was provided by defendant's employees at the David Grant Medical Center ("David Grant") at Travis. From 1986 to June 1988, Mrs. Hanna's treating physician was Dr. Jan Hobbs, a David Grant surgeon specializing in ear, nose and throat disease. After conservative treatment failed, on June 23, 1987, Dr. Hobbs performed a superficial lobectomy on Mary Hanna's left parotid gland.[1]

Following the June 1987 surgery, Mary Hanna continued to complain of pain from her left parotid gland. When the antibiotic treatment failed, Dr. Hobbs referred plaintiff to Dr. Paul J. Donald, an otorhinolaryngologist at the U.C. Davis Medical Center. Dr. Donald agreed to perform a complete left parotidectomy, but plaintiff declined, preferring that Dr. Hobbs perform that surgery. On March 22, 1988, Dr. Hobbs performed the operation successfully but inadvertently severed plaintiff's left facial nerve.

This court's jurisdiction is predicated upon 28 U.S.C. § 1346(b) which provides that the district courts "shall have exclusive jurisdiction of civil actions on claims against the United States for ... personal injury ... caused by the negligent or wrongful act or omission of any employee of the government

---

1. The record contained significant evidence indicating that Dr. Hobbs removed the accessory gland in the 1987 surgery. While Dr. Donald appeared not to appreciate this fact in his examination and diagnosis of Mrs. Hanna, he stopped short of testifying that when he examined plaintiff the lobe remained.

1392

while acting within the scope of his office or employment." 28 U.S.C. § 1346(b).

The Federal Tort Claims Act provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The government is liable only to the extent that a private person would be liable under the law of the state in which the tort occurred. 28 U.S.C. § 1346(b). Because Travis, the site of the alleged malpractice, is located in California, California tort law controls in this case.

█ Under California law, "a physician has a duty to disclose to the patient· all material information ... needed to make an informed decision regarding a proposed treatment;" *Arato v. Avedon,* 5 Cal.4th 1172, 23 Cal.Rptr.2d 131, 858 P.2d 598 (September 30, 1993); in this case, information about the risk of paralysis from injury to the facial nerve was material information that plaintiff was entitled to know before choosing the March 1988 surgery.

█ To fulfill the duty of disclosure to a patient, a physician must disclose in lay terms (1) "the available choices with respect to proposed therapy" and (2) "the dangers inherently and potentially involved in each" such as will enable the patient to make an intelligent choice. *Arato,* at 1183, 23 Cal. Rptr.2d 131, 858 P.2d 598 (citing *Cobbs v. Grant,* 8 Cal.3d 229, 243, 104 Cal.Rptr. 505, 502 P.2d 1 (1972)). The trier of fact must consider the "overall medical context" in deciding "whether a challenged disclosure was reasonably sufficient to convey to the patient information material to an informed treatment decision." *Id.*

█ To prevail, plaintiff must demonstrate by a preponderance of the evidence that: (1) Dr. Hobbs breached his duty to give her all material information prior to eliciting her consent, and (2) but for Dr. Hobbs' failure to provide the required information, plaintiff would have declined the surgery. *Hutchinson v. United States,* 841 F.2d 966, 968 (9th Cir.1988). To meet her burden, plaintiff must demonstrate "what ... a prudent person in the patient's position [would] have

decided if adequately informed of all significant perils." *Cobbs v. Grant,* 8 Cal.3d 229, 245, 104 Cal.Rptr. 505, 515–16, 502 P.2d 1, 11–12 (1972) (citing *Canterbury v. Spence,* 464 F.2d 772, 791 (D.C.Cir.1972)).

The essential question in this case is whether plaintiff received adequate information about the risks of surgery and in particular the risk of facial paralysis prior to the 1988 operation.

Plaintiff first suffered from parotitis no later than October 30, 1981, when plaintiff underwent cannulation of her left Stenson's duct for a left paratoid sialography. Exh. F–12. In 1982, plaintiff had a stone removed from her parotid duct. Exh. F–4. Between 1981 and 1987 plaintiff visited ear, nose and throat doctors at David Grant "pretty much continually" for relief from her parotitis symptoms because she suffered from "several" recurrent infections which caused her to miss work, and for which Tylenol # 3 and antibiotics were prescribed.

In 1985 plaintiff suffered a "toxic" episode; she was treated with intravenous antibiotics for high fever, massive swelling and trismus (lockjaw) that developed when the gland infection spread throughout her body. *See,* Exh. C–1. Between 1985 and 1987 plaintiff was treated with oral antibiotics. Plaintiff suffered a second toxic episode in April or May 1987. She spent two weeks in the hospital on intravenous antibiotics and was given Demoral for her pain. Plaintiff testified that she was "out of it" for a week or ten days. After the swelling and infection died down plaintiff underwent a partial parotidectomy on June 23, 1987. Exh. C–1. Plaintiff's condition worsened between 1987 and 1988. Plaintiff suffered from chronic pain and infection and lost 20 pounds. Plaintiff testified that the pain worsened in 1988 and that she was "never sicker in [her] life." She could not recall whether the pain of delivering three children was worse than the pain of the parotitis.

In March 1988, on Dr. Hobbs' referral, plaintiff visited Dr. Donald. Dr. Donald scheduled plaintiff for surgery on March 23, 1988, but plaintiff cancelled the surgery on March 4, 1988, preferring that Dr. Hobbs

operate. Dr. Hobbs performed the second surgery, a complete parotidectomy, on March 21, 1988.

■ Plaintiff testified that she did not recall having undergone tests and procedures between 1981 and 1987 involving her left parotid gland; that she was "fine" in the months between her first and second surgery; that she did not suffer from a constant, uncontrollable problem between the first and second operations; that Drs. Hobbs and Donald did not make significant attempts to use alternative treatments such as diet or antibiotics before recommending the second surgery; and that Dr. Hobbs explored no other treatment options with her when he recommended the 1988 surgery, but rather pressured her into undergoing the second surgery prior to his anticipated transfer as her sole alternative and as the solution to her problem.

Contrary to plaintiff's testimony, there was abundant evidence that Dr. Hobbs not only proposed but actually pursued alternative treatment prior to suggesting either surgery and that further antibiotic treatment was inappropriate in light of plaintiff's recurrent infections. Dr. Hobbs attempted antibiotic therapy over the course of several months. He performed a partial parotidectomy in the hope that the operation would cause the remaining portion of the gland to atrophy and thereby alleviate plaintiff's problem. Dr. Hobbs recommended surgery only as a final alternative when the gland did not atrophy and after plaintiff suffered progressively more painful recurrences of parotitis, because without the surgery plaintiff faced the likelihood of chronic pain, a recurrence of pus draining into her mouth, and another toxic episode.

Both Dr. Hobbs and Dr. Donald testified that plaintiff weighed the options of continued antibiotic treatment and surgery and decided after reflection to proceed with the operation. The overall medical context corroborates this testimony.

In sum, the record supports a finding that plaintiff suffered from progressively more serious parotiditis, and that Dr. Hobbs not only informed plaintiff of her available treatment options but attempted a number of alternative treatments before suggesting the complete parotidectomy. Therefore, Dr. Hobbs fulfilled his first duty of disclosure to plaintiff.

A physician also has a duty to inform his patient of all material risks of a proposed treatment prior to eliciting her consent to a procedure. *Cobbs*, 8 Cal.3d at 243, 104 Cal. Rptr. at 514, 502 P.2d at 9.

■ At trial Dr. Hobbs and Dr. Donald estimated that the risk of facial nerve severance was ten to fifteen percent but that they did not inform plaintiff of the risk in such terms. This omission does not *per se* dictate a finding that the doctors failed to warn plaintiff of the risk of facial paralysis, however. *See, Arato* 5 Cal.4th at 1184, 23 Cal. Rptr.2d 131, 858 P.2d 598. (Specific disclosures such as patient life expectancy as revealed by mortality statistics are not required in every case because "it is unwise to require *as a matter of law* that a particular species of information be disclosed.")

Plaintiff testified that neither Dr. Hobbs nor Dr. Donald ever informed plaintiff in *any manner* of the risk of facial nerve severance and paralysis prior to her 1988 surgery. Plaintiff testified that in their numerous consultations Dr. Hobbs never mentioned the possibility of severance, "looking like a stroke victim," inability to close her eye, or Frye's syndrome—a condition in which the nerves formerly connected to the salivary glands attach themselves to the sweat glands, causing the person's cheek to perspire each time she would ordinarily salivate. She admitted that Dr. Hobbs described the surgery and showed her how it was to be done, using a picture of the gland. She stated that she "does not think" Dr. Hobbs said the 1988 surgery would be harder than the first one because the formation of scar tissue obscured the nerve.

Dr. Hobbs, however, recalled discussing the risks of surgery in the course of several of plaintiff's seventeen visits between 1987 and 1988, as well as before the first surgery. Dr. Hobbs testified that while he could not recall the specific words he used, he informed plaintiff that the operation presented a "great" risk and "high incidence" of facial

paralysis, loss of function on the affected side, possibility of drooping, asymmetry, "one side won't look like the other," possible weakness, complete loss of function, inability to move the muscles on that side of the face, and numbness. He did not specifically mention the risk of eye paralysis, because he feels that such a warning is redundant in light of his general warning that one side of a patient's face might be paralysed. He further testified that it is his usual and customary practice to inform patients of the risks of infection, bleeding, numbness, facial nerve paralysis that would cause one side of the face not to look like the other, inability to move the facial muscles, potential for drooping, sweating and Frye's Syndrome. He believes he "may have" used the word "stroke" in explaining the risks to plaintiff before the 1988 surgery. He testified that plaintiff understood and consented and asked questions regarding the length of surgery and how long she would remain in the hospital.

Plaintiff attempted to impeach Dr. Hobbs' testimony on a number of grounds. First, in response to Dr. Hobbs' testimony that he specifically remembered telling plaintiff of the risk of facial paralysis inherent in repeat parotidectomy, plaintiff proffered Dr. Hobbs' deposition testimony that he could not recall specifically what he had said to plaintiff before the surgery. When the question was put to him at his deposition, however, Dr. Hobbs had before him Exhibit B–1, the medical record from March 21, 1988, containing Dr. Hobbs' preoperative notes stating "procedure and potential complications explained, i.e. facial nerve paralysis." Dr. Hobbs testified at trial that while he did not recall what he said to plaintiff on March 21, the night before surgery, he did recall having told plaintiff of the risks on prior occasions in his office. Dr. Hobbs' deposition testimony does not impeach his testimony at trial because it is not inconsistent.

Second, plaintiff sought to question the authenticity of Exhibit B–1. The anesthesiologist made his preoperative note before Dr. Hobbs recorded that plaintiff was informed of the risks and consented to the surgery. Plaintiff sought an inference that Dr. Hobbs recorded plaintiff's consent only *after* the

surgical misadventure. Dr. Hobbs and Dr. Sykes, both of whom practiced in David Grant's otorhinolaryngology department, stated that the order in which the anesthesiologist and surgeon made their final notes is common at Travis. Dr. Hobbs testified that anesthesiologists customarily made their rounds in the early afternoon after completing surgery, while Dr. Hobbs proceeded to his clinical practice until 5:00 or 5:30 p.m. before making his hospital rounds.

Third, plaintiff contended that defendant violated David Grant internal policy by failing to use a written consent form listing all possible risks of parotidectomy surgery like a gynecology department consent form regarding contraception methods, Exhibit F–9. The evidence does not establish that all departments at David Grant are required as a matter of policy to make and use forms like Exhibit F–9 for every procedure. There was no evidence that such a form has been in use either in the David Grant otorhinolaryngology department or in other hospitals as a matter of course.

Plaintiff also testified that Dr. Donald failed to warn her of the risk of facial nerve paralysis and denied ever having been aware of Dr. Donald's plan to perform the surgery.

Dr. Donald testified that he saw plaintiff in consultation on Dr. Hobbs' reference and scheduled her for surgery. He testified that he specifically remembered warning plaintiff of the risk of facial paralysis, because he scheduled her for surgery following the consultation. The fact of the consultation was stipulated in the pretrial order, and the documentary evidence compels a finding that the surgery was actually scheduled.

Plaintiff attempted to impeach Dr. Donald's credibility on the grounds that Dr. Hobbs referred plaintiff only for consultation, not surgery, and his records do not reflect discussion with plaintiff of the risks of repeat parotidectomy. Regardless of the purpose of Dr. Hobbs' referral, however, at the time Dr. Donald examined plaintiff, Dr. Donald understood that he was to perform the second surgery. Dr. Donald testified that he "never" schedules a patient for surgery without first informing her of the risk of facial nerve paralysis. Finally, he specifically recalled

informing plaintiff of that risk. Plaintiff, on the other hand, testified that she could not recall whether he had discussed the subject with her at their meeting but did recall his telling her "there was a lot of scar tissue."

Dr. Donald's testimony is credible. First, Dr. Donald specifically recalled discussing the risks with plaintiff, while plaintiff could not recall whether he told her or not. Second, plaintiff's recollection that Dr. Donald mentioned the existence of scar tissue in their consultation is consistent with Dr. Donald's testimony, since the risk of paralysis is enhanced in repeat parotidectomies due to the existence of scar tissue. Third, Dr. Donald is a teaching physician who specializes in this area of medicine and teaches informed consent to residents. He testified that he *always* tells patients of this risk and teaches his students so to do. It is unlikely that Dr. Donald, a teaching physician who trains interns in parotidectomy surgery and eliciting informed consent as to its inherent risks, whose invariable practice is to discuss facial nerve severance with his patients, who has a specific recollection of his consultation with plaintiff, did not inform Mrs. Hanna of the risk of paralysis prior to scheduling her for surgery.

By contrast, plaintiff's memory of pertinent events is obviously confused. At trial plaintiff denied having known that stones in her salivary glands caused her recurrent infections. In 1981, however, she signed a written consent to an in-office procedure by Dr. Jacobson (a former David Grant doctor) to make an incision to probe for a stone. Plaintiff could not recall if Dr. Jacobson performed the operation in 1981 or 1987, but acknowledged that Dr. Jacobson operated before 1984. Plaintiff repeatedly denied that she had ever suffered from chronic infection of the salivary glands, pus draining into her mouth, facial swelling or other symptoms of parotitis prior to the 1987 surgery. The medical records convincingly demonstrate that her memory is faulty. Plaintiff also denied ever having been scheduled for surgery by Dr. Donald or ever having called to cancel the operation. She testified that she

was "fine" in 1987 after the first surgery and did not want the second operation. There was evidence, however, that plaintiff in fact visited the clinic seventeen times for treatment for ongoing infection between the first and second surgeries. Confronted with this evidence, plaintiff responded that the doctors "were lying." Finally, plaintiff's testimony that Dr. Hobbs and Dr. Donald told her *nothing* of alternative treatment or the risk of paralysis is inconsistent with the fact that she signed a consent form acknowledging that she was told of "the risks."

Both Dr. Donald and Dr. Hobbs informed plaintiff of the risk of facial nerve paralysis. This finding is substantiated by the testimony of both doctors that they discussed the risk with plaintiff; the fact that plaintiff recalled discussing the procedure with both Dr. Hobbs and Dr. Donald and discussing the presence of scar tissue with Dr. Donald; and evidence that after plaintiff's 1987 surgery, she suffered temporary "slight left sided lip weakness"[2] from trauma to the facial nerve, which should have put plaintiff on notice of the possibility of facial nerve injury.

■ Plaintiff contends that even if Dr. Hobbs and Dr. Donald told plaintiff of the general risk of facial nerve severance, they were required to disclose graphic details of the consequences and the statistical probability of the risk of facial paralysis.

Dr. Hobbs in fact described the material details of the consequences of facial nerve paralysis, e.g. drooping, asymmetry, total loss of function and inability to move the muscles on the affected side of the face. In any case, the disclosure by both doctors that the left side of plaintiff's face might become *paralyzed* was adequate foundation for plaintiff's informed consent absent questions by plaintiff about the detailed implications of facial paralysis. Similarly, plaintiff was told there was a *greater* risk of facial paralysis because scar tissue from the 1987 surgery obscured the nerve. Mrs. Hanna's avoidance of any questions about the precise magnitude of the involved risks is the best evidence that it was not material to her. In addition,

---

**2.** On direct examination plaintiff denied slight left-sided lip weakness after the 1987 operation, but on redirect admitted that she "doesn't remember if [she] had that."

plaintiff offered no evidence that the pertinent statistics had any reliable predictive value when applied to her individual case. Thus, Dr. Hobbs' omission to provide more graphic details about the consequences of severing the facial nerve or to provide the statistical probability of such a misadventure among all physicians performing such an operation was not a breach of his duty to provide all information requested for plaintiff's informed consent to the surgery.

■ To prevail, plaintiff also must demonstrate objective causation. Plaintiff testified at trial that had she known of the risk, she never would have agreed to the surgery. According to her testimony and all the medical records, however, plaintiff was in a great deal of pain after her 1987 surgery and repeatedly visited Dr. Hobbs between 1987 and 1988. Dr. Hobbs testified that another toxic episode could have caused nerve damage or been fatal. Plaintiff has not proved by a preponderance that a prudent person in like situation would have foregone the surgery.

For the foregoing reasons, the court finds that plaintiff's testimony is not credible and that she has not demonstrated that Dr. Hobbs breached his duty of care toward plaintiff or that a reasonably prudent person in plaintiff's position would have chosen to forego the surgery if she had been better informed of the risks.

For all of the foregoing reasons, plaintiff is entitled to no relief and, pursuant to Fed. R.Civ.P. 58, the clerk shall enter judgment for defendant.