Filed 12/16/13  Bakotich v. City of Los Angeles CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| PETER J. BAKOTICH et al., | B239418 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC442344) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Appellant. | |

———————————

APPEAL from a judgment of the Superior Court of Los Angeles County, Teresa Sanchez-Gordon, Judge.  Affirmed in part as modified, reversed in part.

Carmen A. Trutanich and Michael N. Feuer, City Attorneys, and Brian I. Cheng, Deputy City Attorney, for Defendant and Appellant.

Law Offices of Gregory W. Smith, Gregory W. Smith; Benedon & Serlin, Douglas G. Benedon and Gerald M. Serlin for Plaintiffs and Respondents.

———————————

# INTRODUCTION

Peter J. Bakotich, Michael Fanning, and Debbie Guerrero, detectives formerly with the Fugitive Warrants Section of the Los Angeles Police Department (the Department), filed this action against the City of Los Angeles (the City) for discrimination and retaliation in violation of the Fair Employment and Housing Act (FEHA; Gov. Code, § 12940). The three detectives alleged that their immediate supervisor, Lieutenant Natalie Cortez, along with her supervisors, Captain Justin Eisenberg and Captain Kevin McCarthy, discriminated against them on the basis of their gender and retaliated against them for reporting the discrimination. The jury found in favor of Bakotich, Fanning, and Guerrero and awarded them economic and non-economic damages. On appeal, the City challenges the jury instructions on adverse employment action and the awards of future economic damages. With the exception of one item of future economic damages and a modification to correct an error in the jury's arithmetic, we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND[1]

A.    *Before Cortez*

Bakotich joined the Department in February 1972. After serving as a police officer for 14 years, the Department promoted him to Detective I in March 1986. He joined the Fugitive Warrants Section, a specialized detective squad that finds and arrests

---

[1]    "Following the usual rules on appeal from a judgment rendered after a trial, we view the facts in the light most favorable to the judgment." (*Blanks v. Seyfarth Shaw LLP* (2009) 171 Cal.App.4th 336, 346, fn. 2; see *Green Wood Industrial Co. v. Forceman Internat. Development Group, Inc.* (2007) 156 Cal.App.4th 766, 770, fn. 2. ["[w]e state the facts in the light most favorable to the jury's verdict, resolving all conflicts and indulging all reasonable inferences to support the judgment"].)

fugitives, in 1989.  Bakotich received promotions to Detective II in November 1998 and to Detective III, a rank just below Lieutenant I, in December 2000.**2**

Prior to 2009, the Department considered Bakotich an exemplary police detective. For example, Bakotich's 2003-2004 performance evaluation stated that he was an "[a]mazing success and [his] leadership adaptability and 100 percent commitment are even more," and that under his "leadership, the watch time has been very happy and productive."  His 2004 performance evaluation described Bakotich as "the cornerstone of institutional knowledge regarding arrest warrants."  According to his 2004-2006 performance evaluation, Bakotich was "the resident expert in fugitive warrant policies," including "fugitive apprehension, extradition, rendition, and all matters that relate[d] to [the] fugitive warrant section."  He knew "how to do everything and do everything right," and he was a "team player" and a mentor for and constantly trained his subordinates. Bakotich was "routinely polite and personable . . . around the office and with the public," and was "respectful of authority in the chain of command."  Through 2008 he had received over 50 commendations and awards for attention to duty, professionalism, investigation, leadership, and commitment to the Department.  He also taught detective courses at the police academy for 20 years.

Fanning, a third generation police officer, began working for the Department on December 1, 1983.  He was promoted to Detective I in the mid-1990's.  He joined the Criminal Conspiracy Section at the end of 1998, where he worked on homicide and other kinds of major cases.  While he was in the Criminal Conspiracy Section, he apprehended Kathleen Soliah, a member of the Symbionese Liberation Army who had been a fugitive

---

**2**      Generally, the promotion progression in the Department is from Police Officer I (probationary officers fresh out of the academy) to Police Officer II (regular police officers) to Police Officer III (training officers).  The career opportunity for officers then branches into two paths, those officers who become Sergeants and those who become Detective I's.  Sergeants become supervisors and can go on to become Lieutenants and Captains, whereas Detectives become investigators and can go on to become Detective II and Detective III.  Captains report to Commanders, who report to Deputy Chiefs, who report to Assistant Chiefs, who report to the Chief of Police.

3

since the 1970's, and worked on several murder cases against her after her capture. In 2006, as a Detective II, Fanning successfully applied for and earned the opportunity to join the Fugitive Warrants Section. He was assigned to night watch with Bakotich.

Prior to 2009 Fanning was also recognized as a model detective. Fanning's performance evaluation from 2006, just before he started in the Fugitive Warrants Section, stated that his "daily interactions with the public are of the highest standards," he "fostered a positive work environment by assisting his co-workers as needed," he "worked as a team member and could be counted on for on-call duty and off-hours responses as needed," and he "embodie[d] on a daily basis, the Department's Core Values." Fanning's first performance evaluation in his new assignment stated that he had "outstanding leadership skills" with a "calm and quiet style of leadership," understood "the importance of treating all persons with respect," and performed "his duties dealing with citizens, victims and suspects . . . treat[ing] each with respect and dignity." The evaluation also stated that Fanning "created an environment where each of his subordinates believes they can be successful," and where "each employee knows he or she will be treated fairly based upon his or her work performance. Detective Fanning has made it crystal clear that retaliation in any form will not be tolerated." The evaluation concluded that Fanning's "loyalty and dedication make him a pleasure to work around. He is an asset to the Department and a valued member of the FWS [Fugitive Warrants Section] supervisory team."

Fanning's performance evaluations for 2007 and 2008, after he had been promoted to Detective III, repeatedly referred to his "exemplary" integrity, honesty, fairness, and impartiality, and called him "an excellent ambassador for the Department." The evaluations also noted that he "supports the Department's Affirmative Action policy" and "ensures that all his employees treat each other with respect and maintains a working environment that allows his employees to develop to their fullest potential." Fanning received over 60 awards and commendations for attention to duty, commitment to excellence, demeanor, teamwork, going beyond the call of duty, professionalism, outstanding investigations, and initiative.

4

Guerrero joined the Department in 1987, and ten years later had risen to Detective I.  She became a Detective II in approximately 2000 and a Detective III in June 2004.  In April 2008 she obtained a position in the Fugitive Warrants Section and joined the day watch.

Guerrero's performance evaluations over the years stated that she "demonstrates reverence for the law and respect for her peace officer authority," and "has an outstanding knowledge of Department procedures, policies, guidelines, Consent Decree mandates and the [P]enal [C]ode."  Guerrero "daily demonstrates the maturity and professionalism to effectively manage and supervise a narcotics enforcement detail," and "does an outstanding job of motivating the officers and ensuring that she and the other supervisors maintain a positive work environment with high morale."  She had "the leadership skills, training and expertise to succeed in any assignment or mission she is given," set a model of police integrity, and was "a self-motivated supervisor always looking for ways to improve her performance and that of her subordinates."  She "regularly demonstrated ethical and lawful behavior," "her administrative work was consistently outstanding," and she was "an engaged, approachable supervisor who created a working environment notable for its high morale and productivity and bereft of harassment, hazing, favoritism or discrimination."  Her supervisor in 2007 stated, "I trust her without reservation to always do the right things for the right reasons and would unconditionally recommend her for any assignment or promotion she should elect to seek in the future."

B.    *Cortez's Discrimination*

In January or February 2009 McCarthy transferred Cortez from the gang section to the night shift of the Fugitive Warrants Section, and Cortez became the lieutenant who supervised Bakotich, Fanning, and Guerrero in the Fugitive Warrants Section.  Cortez

reported to Eisenberg, a Captain II, who in turn reported to McCarthy, a Captain III.[3] Cortez had a "special relationship" with McCarthy. Cortez constantly talked about her close friendship with McCarthy's wife Debbie McCarthy, who was a Deputy Chief, and repeatedly bragged to the detectives in the Fugitive Warrants Section, "Debbie McCarthy is my friend and mentor and I can go directly to KM [Kevin McCarthy] and get whatever I want."

Cortez arrived in the Fugitive Warrants Section with a plan to replace the male supervisors, like Bakotich and Fanning, with female supervisors. Shortly after her arrival in late January or early February 2009, Cortez told Guerrero, "Gosh, I wish I could have females working for me." Cortez also said that "she liked to mentor females and she wanted to get the girls to go out to lunch" without the male officers in the squad. In another conversation in the women's restroom, Cortez stated that she wanted all females working for her on the night watch, and she told Guerrero to "keep an eye" on Fanning and Bakotich and tell her what they "were up to." Cortez told another supervisor, Detective Ramona Findley, that if she had her "way basically [she] would have all female supervisors," and that she "believed that females in general were better employees and worked better than males." Cortez also told Findley that she liked to "mentor women and take care of women" and focus her energy on women.[4]

Bakotich at first "got along pretty well" with Cortez, but after Guerrero told Bakotich that Cortez "wanted to replace the male supervisors at [night] watch with females," he found it "difficult to form a strong harmonious relationship with someone

---

[3]    By the time of trial in September 2011, McCarthy had been promoted to Commander, and Eisenberg had been promoted to Captain III.

[4]    Guerrero found these comments troubling. She testified, "I was taken aback because [of] my reputation of working hard and staying focused and it was bothersome to me because that was something that was so appalling to me that I didn't care for that comment. It was wrong." Findley was offended by Cortez's comments because Findley had been with the department 28 years and "had never been promoted because she was a woman."

who wants to get rid of you." Fanning too learned that Cortez had told other female supervisors that "she wanted to replace the men supervisors on night [shift] with females."

Cortez admitted that she understood that making a comment that she preferred to have all female supervisors on night watch is against the Department's policy. McCarthy also admitted that it would have been improper for Cortez to attempt to remove male detectives from a position and replace them with female detectives on the basis of their gender. Similarly, Eisenberg stated that if he had heard that Cortez had wanted all females on the night watch, it would have been improper and required an investigation.

### C.  *After Cortez*

Cortez successfully implemented her discriminatory plan. Bakotich was first.

McCarthy directed Eisenberg to "bench" Bakotich because McCarthy "was not satisfied that Bakotich was supporting Lieutenant Cortez or following her lawful directions." McCarthy decided to bench Bakotich based on information he received "secondhand" from Cortez, who went over Eisenberg's head and spoke directly to McCarthy about issues she was having with Bakotich, and from Eisenberg, who got his information from Cortez.[5] McCarthy acknowledged that he received "all [of his] information" from Cortez because "that's the chain of command." For example, Cortez told McCarthy directly or through Eisenberg that Bakotich said that one of the captains was "useless" and "doesn't know what he's f'ing doing," that Cortez was young and did not know what she was doing, and that McCarthy and Eisenberg did not know what they were doing. Cortez also told McCarthy that Bakotich and Fanning were "resistant" to his goals for the Department. McCarthy also based his decision on hearing that Bakotich had been "challenging Lieutenant Cortez in front of several subordinates." McCarthy

---

[5]     McCarthy made the decision to bench Bakotich, however, without consulting Eisenberg and without Eisenberg's recommendation.

7

admitted, however, that he was not aware that Bakotich, Fanning, or Guerrero had ever refused an order by Cortez.

Eisenberg followed McCarthy's order and benched Bakotich on April 15, 2009. Eisenberg explained to Bakotich that he had been "disrespectful to Lieutenant Cortez," an accusation that was not true. Eisenberg told Bakotich, "You are benched and you no longer have a squad. I'm taking away your supervisory authority. You cannot respond to the field for any reason whatsoever. Whether it be personnel complaints, use of force, whatever, you cannot respond. You are to remain at your desk and perform the due diligence . . . function only." Bakotich stated, "I was told I no longer had my squad to supervise, that my supervisory authority had been suspended, that I was not allowed to respond to any situations in the field. I was not allowed to participate in arrests or any field investigations." Eisenberg stated there was "no doubt that . . . Bakotich was benched," as opposed [to] merely "assigned to a new position," because a "reassignment" would have been changing his shift or supervising a different squad. According to Bakotich, Eisenberg "advised me quote, 'You are benched.'"[6]

Cortez told Guerrero that Bakotich "was getting benched" and that Cortez wanted Guerrero to replace Bakotich on the night watch. Cortez told Guerrero that she could bring anyone she wanted to bring with her from day watch. Guerrero moved to night watch and took over Bakotich's squad on or about April 26, 2009.

The day after Eisenberg benched Bakotich, Cortez asked Bakotich for his car keys and took away his car privileges. This made it difficult for Bakotich to get from his office to the "offsite locations" where he taught classes. After that, Bakotich's job duties included replacing cabinetry and boxing up and transporting case files. He was also assigned to do "due diligence" paperwork on arrest warrants, which was essentially "duplicating performing a meaningless task that's already been done." McCarthy did not anticipate transferring Bakotich back to his field assignment.

---

**6**    Cortez told Fanning that Bakotich "was going to be benched" and that it was McCarthy's decision.

8

Fanning was next.

In late April or early May 2009 McCarthy decided to send Fanning from the Fugitive Warrants Section to a division referred to as RACER.[7]  McCarthy called Fanning into his office and told Fanning that he was sending Fanning "on a long term loan to RACER effective immediately" and to pack his belongings.  Fanning had never requested a transfer to RACER.[8]  McCarthy told Fanning that the reason he was transferring Fanning from the Fugitive Warrants Section to RACER was that Fanning was "disrespectful to Lieutenant Cortez," and that "it was only business."[9]  Prior to this time, however, Cortez never told Fanning that he had been discourteous to her.  Eisenberg agreed with McCarthy's decision to send Fanning to RACER "based on [the] conflict between Fanning and Bakotich with Lieutenant Cortez."  Eisenberg said Fanning's conflict with Cortez was the "main reason" Fanning was transferred from the Fugitive Warrants Section.

Fanning packed his bags, made a telephone call to find out where RACER was, and learned that it was in a small basement room six floors beneath city hall.  At RACER, Fanning worked nights essentially as a message service for investigators in the field, ran criminal histories for other detectives, and "put a dot on a map."  Describing the work he did in RACER, Fanning explained, "Basically, it was to send out Blackberry messages to

---

[7]    RACER is the "real time analysis division. . . .  All notifications go to [the] RACER division and they decide who gets notified."  RACER receives notifications of "every single victim, shooting, every homicide, every traffic collision that involves a police officer or fatality."

[8]    Fanning's Standards Based Assessment states that he was "transferred." McCarthy testified that this was a mistake.

[9]    McCarthy testified that he changed Fanning's assignment because he heard that Fanning had stated in a meeting with his squad that he was not told "what the mission was," and McCarthy thought Fanning did not "have the best interests of the department in mind."  Eisenberg, however, said that Fanning understood his mission, and that McCarthy never said anything about Fanning not understanding his mission.  McCarthy also felt Fanning was resistant to change.

9

the captains and the command staff when there was something that happened . . . . It was a messaging service. They were like tweeting messages. There was very little. I didn't see any investigations going on." After having supervised some of the largest and most important investigations in the Department, and working in a position that was "sought after" by other Detective III's, Fanning had little to do at RACER but watch the Lakers finals and American Idol on television. As Fanning put it, "they buried me there."

Approximately one month after his transfer to RACER, Fanning, in order to escape the figurative and literal burial at the underground RACER office, requested a transfer to a division back in the field, Hollenbeck, where he was able to work on basic robbery and homicide cases, as he had done when he was starting out as a Detective I. The position at Hollenbeck was not part of a specialized unit like the Fugitive Warrants Section, and it was not a coveted position. It was "going . . . the wrong way" from a specialized unit to a general "table" assignment.

And finally, for resisting Cortez's plan, Guerrero.

After Cortez learned that Guerrero had spoken to Fanning about what had happened to him, Cortez called Guerrero at home and told her to come in for a meeting. Cortez was angry, "vicious," and screamed at Guerrero, "totally out of control." Findley, who witnessed the telephone call, observed that Cortez was angry with Guerrero because Guerrero had told Bakotich and Fanning about Cortez's plans to replace them with female supervisors. Guerrero took notes of the telephone conversation because she was concerned about Cortez's requests "to assist her and engage in acts of discrimination against Mike Fanning and Pete Bakotich" and Cortez's accusations that she was "part of the problem," which caused Guerrero to become concerned about her job. Guerrero stated that the subsequent meeting with Cortez "was pretty humiliating. I've never been spoken to that way before. And in closing, she told me that she wanted all female supervisors in that division and that she was an advocate for women and you could say she was guilty of gender bias but oh, well, she wanted women to succeed. And she said that if I did everything she wanted me to do, which I took as spying on the guys, that I

would make it there." Otherwise, Cortez made it "very clear to me that if I didn't do what she told me to do, I would be moved just like it happened to Pete and Mike."

Guerrero subsequently suffered a knee injury during a live fire training exercise in May 2009 and required treatment and placement on restricted duty. This created an opportunity for Cortez to get rid of Guerrero. Cortez ordered Guerrero to work a command post at the June 17, 2009 Lakers championship parade, which aggravated Guerrero's injury. On June 24, 2009, while Guerrero was still on restricted duty because of her injury, McCarthy sent her an email stating that because of her "light duty status" she would no longer be in charge of her squad. McCarthy sent this email the day after Guerrero had contacted the Inspector General's office to report Cortez's discrimination. Guerrero had decided to file a report with the Inspector General because Cortez "had already made it pretty clear that I had to continue and wanted me to engage in the acts of discrimination that I clearly refused to do, and based on the way she had treated me and spoken to me, I was really concerned for my job."[10]

After Guerrero lost her squad, Cortez had her "doing time keeping, inputting into the computer people's daily time worksheets," and performing "random audits" assigned by Cortez. Eventually Eisenberg called Guerrero into his office and, although he did not offer to return Guerrero to her squad in the Fugitive Warrants Section, he said he would help her transfer somewhere else.

D.    *Damages*

After his benching, Bakotich no longer received any overtime. Because Eisenberg made it "very clear" that Bakotich "was not allowed to respond to the field for any reason whatsoever," and that "whatever may be, [he] was not allowed to respond," Bakotich

---

[10]    Bakotich and Fanning also filed reports with the Office of the Inspector General. The Office of the Inspector General referred the three matters to Internal Affairs, but there never was an investigation.

could not earn any overtime compensation. Had Bakotich remained in the field, he would have continued to garner overtime.

Bakotich also failed to obtain a teaching position that he believed was because of interference by someone at the Department. In March 2011 Bakotich applied for a job teaching a private police academy course at Rio Hondo College and had a telephonic interview for the position with a retired Los Angeles Police Department captain, who initially "seemed interested" in Bakotich. After a few follow-up discussions, the retired captain stopped returning Bakotich's calls. Bakotich never got this job, which would have paid him between $50,000 and $77,000.

While Fanning was with the Fugitive Warrants Section, he earned $12,000 to $15,000 per year in overtime. At RACER, Fanning did not work any overtime, and he did not believe there was any overtime in RACER. Even after Fanning moved to Hollenbeck, Fanning rarely worked overtime anymore.

Fanning also suffered a loss of retirement benefits resulting from entering into the DROP (Deferred Retirement Option Plan) retirement program earlier than he had planned. The DROP program allowed police officers to "retire" as of a particular date, continue to work for five additional years after that date, and then actually retire. During the five year period, the City paid the officer his or her salary and paid the officer's retirement benefits into a fund. At the end of the five year period, the officer received the accumulated five years of benefits in a lump sum.[11]

---

[11]    "The DROP was intended to offer an incentive to officers who were eligible to retire to continue working for the LAPD, as it was having difficulty recruiting new officers and retaining veteran officers. Under the DROP, eligible officers could 'retire' and commence drawing their pensions while continuing to work and earning a salary for up to an additional five years. Rather than actually receiving monthly pension payments, however, a DROP account was created which would be credited monthly in the amount of the member's pension payment." (*In re Marriage of Davis* (2004) 120 Cal.App.4th 1007, 1011-1012.) "Upon discontinuing participation in the DROP and terminating employment with the LAPD, the member would begin to receive monthly pension payments based upon years of service and salary at the time of entering the DROP, plus cost of living increases received while in the DROP. At that time, members could

12

Prior to his removal from the Fugitive Warrants Section, Fanning had planned to "go in DROP" when he was 52 years old, so that he would be at the maximum retirement benefit level of 70 percent. Thus, Fanning had intended to go into the DROP program in December 2013, and continue to work another five years until December 2018, collecting both salary and deferred retirement benefits for those five years. Instead, because of what happened to him in this case, Fanning went into the DROP program in January 2011, almost three years earlier than he had planned. As a result, Fanning will be retiring at a benefit level of 64 percent rather than 70 percent.

Guerrero, like Fanning, experienced a considerable decrease in her overtime compensation after her removal from the Fugitive Warrants Section. In addition, Cortez's actions and their consequences affected Guerrero's retirement plans. Like Fanning, Guerrero decided to enter the DROP program early, so that she too will have a lesser pension percentage than she otherwise would have had.

Karen Smith, a forensic economist, calculated the amount of economic losses due to loss of overtime and retirement benefits by Bakotich, Fanning, and Guerrero. After reviewing and analyzing the detectives' payroll documents, overtime history, the Department's pension records, and other information, Smith calculated that Bakotich lost $2,523 in overtime, which represented the amount of overtime Bakotich would have earned had he continued to work as a field supervisor in the Fugitive Warrants Section from April 16, 2009, when he was benched, to February 19, 2010, when he retired.

Similarly, Smith calculated that Fanning lost $19,738 in past overtime and $34,332 in future overtime, for a total of $54,070. On the issue of reduced retirement benefits, Smith calculated two different scenarios for Fanning, one where Fanning went into the DROP program three years earlier than he had planned, and one where he was

receive the DROP funds in a lump sum, or could elect to roll the funds over into a tax-deferred account." (*Id.* at p. 1012.)

13

promoted to lieutenant before retiring a year later.[12]  Smith calculated these damages as $336,976 and $540,151.  Adding the $19,738 in lost past overtime to the future lost overtime and reduction of retirement benefits, Smith calculated that the two scenarios produced economic damages of $356,714 and $559,889.

And for Guerrero, Smith calculated a loss of overtime, past and future, of $5,744. Smith calculated that Guerrero's loss of retirement benefits was $573,304 assuming that she had stayed in the Fugitive Warrants Section and decided to retire early,[13] or $962,644, assuming that she could have transferred back into the narcotics division where she could have earned even more overtime (i.e., she lost a greater amount of overtime).

E.    *The Verdict*

After a 10-day trial the jury found in favor of all three plaintiffs.  The jury found that Bakotich, Fanning, and Guerrero had been the victims of gender discrimination and retaliation and had all suffered adverse employment actions that materially affected the terms and conditions of their employment.  The jury awarded Bakotich $2,523 in past economic damages, $50,000 in future economic damages, $225,000 in past non-economic damages, and $225,000 in future non-economic damages, for a total of $502,523.  The jury awarded Fanning $20,000 in past economic damages, $360,000 in future economic damages, $250,000 in past non-economic damages, and $250,000 in future non-economic damages, for a total of $880,000.  Finally, the jury awarded Guerrero $5,800 in past economic damages, $580,000 in future economic damages,

---

[12]    Smith also calculated a third scenario where Fanning did not retire and go into DROP early; i.e., no loss of retirement benefits and a pure loss of (past and future) overtime.

[13]    Counsel for the City referred to this figure in cross-examination as $580,000.

14

$250,000 in past non-economic damages, and $250,000 in future non-economic damages, for a total of $1,085,000.**14** The trial court entered judgment on December 7, 2011.

On February 10, 2012 the trial court denied the City's motions for judgment notwithstanding the verdict and for a new trial. The trial court noted that the City "named every statutory ground for the motion [for a new trial] and failed to state in the memorandum of points and authorities which grounds were being argued." The court then found that "[t]here was sufficient evidence to support the verdict. The testimony provided by plaintiffs was sufficient to establish that [the Department's] actions in removing them from their positions severely harmed their careers and was in fact punishment. There was expert testimony as to the amount of damages the plaintiffs suffered and the verdict is reasonably consistent with that testimony." The court also ruled that "[a]s to the argument that the jury instructions given were an error in law, [the City] failed in its motion to show how its instructions differed from the given instructions or what part of the instructions given misled the jury and how the jury was misled." The City filed a timely notice of appeal on February 24, 2012.

## DISCUSSION

The City makes two arguments on appeal. First, the City contends that the trial court erred by giving an erroneous jury instruction on what constitutes adverse employment action and by refusing to give the City's proposed instructions on adverse employment action. Second, the City argues that there is no substantial evidence to support the jury's award of future economic damages. We conclude that the jury instructions on adverse employment action were correct, and, with one exception relating to Bakotich's award for loss of future earnings, that there is substantial evidence to support the award of future economic damages. We therefore affirm the judgment in part

---

**14** The jury added these sums incorrectly. The actual total is $1,085,800. We will modify the judgment accordingly.

and reverse in part as to Bakotich, and affirm the judgment in its entirety as to Fanning and Guerrero.

A.      *Standard of Review*

"'The propriety of jury instructions is a question of law that we review de novo.'" (*Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 418.)  "A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.)  "The trial court has no duty to instruct on its own motion, nor is it obligated to modify proposed instructions to make them complete or correct." (*Maureen K. v. Tuschka* (2013) 215 Cal.App.4th 519, 526.)  "A court also may refuse an instruction requested by a party when the legal point is adequately covered by other instructions given." (*Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 475; accord, *Bell v. H.F. Cox, Inc.* (2012) 209 Cal.App.4th 62, 80; see *Arato v. Avedon* (1993) 5 Cal.4th 1172, 1189, fn. 11 ["[i]t is not error . . . to refuse to give an instruction requested by a party when the legal point is covered adequately by the instructions that are given"].)  "The refusal of a proper instruction is prejudicial only if "'it seems probable" that the error "prejudicially affected the verdict." [Citations.]'" (*Bell*, *supra*, at p. 80.)

"We review the jury's award under the substantial evidence standard and defer to the trial court's denial of a new trial motion based on excessive damages because of the trial judge's greater familiarity with the case.  The amount awarded is peculiarly within the jury's discretion." (*Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 720.)  The amount of damages is a question of fact committed first to the discretion of the jury and second to the discretion of the trial judge on a motion for new trial.  (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1067; see *Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 691 [amount of damages "is a fact question committed to the discretion of the trial judge on a motion for new trial; an award of damages will not be disturbed if it is supported by substantial evidence"].)  "A reviewing court must uphold an award of

16

damages whenever possible . . . ." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 61; see *Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1078.)

B.        *The Jury Instructions on Adverse Employment Action Were Not Erroneous*

To establish a prima facie case of discrimination under FEHA, the plaintiff must show "(1) the plaintiff was a member of a protected class, (2) the plaintiff was qualified for the position he or she sought or was performing competently in the position held, (3) the plaintiff suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests a discriminatory motive." (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1004; see *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355.)  For retaliation under FEHA, "a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042; see *McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 298.)

The City does not contend that that there is no substantial evidence to support the jury's findings that Bakotich, Fanning, and Guerrero were subject to discrimination and retaliation that materially affected the terms and conditions of their employment and subjected them to adverse employment action.  Rather, the City argues that the trial court erred when it "rejected the City's instructions [on adverse employment action] and instead, over the City's objections, instructed the jury pursuant to competing instructions offered by Plaintiffs that improperly misled the jury, causing [it] to conclude incorrectly that Plaintiffs suffered adverse employment actions when they did not."  On the issue of prejudice, the City argues that "the issue of whether each Plaintiff suffered an adverse employment action was crucial to the outcome of the trial, and correct instruction on the applicable law was necessary in order for the parties to obtain an appropriate decision from the jury."

17

Adverse employment action includes "the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career. Although a mere offensive utterance or even a pattern of social slights by either the employer or coemployees cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment for purposes of [Government Code] section 12940[, subdivision ](a) [discrimination] (or give rise to a claim under [Government Code] section 12940[, subdivision ](h) [retaliation]), the phrase 'terms, conditions, or privileges' of employment must be interpreted liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination that the FEHA was intended to provide." (*Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at p. 1054, fn. omitted; see *Taylor v. City of Los Angeles Dept. of Water & Power* (2006) 144 Cal.App.4th 1216, 1233 [*Yanowitz* gives a "broad interpretation of the materiality test"], disapproved on another ground in *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1173-1174.)

"Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of [Government Code] sections 12940[, subdivision ](a) and 12940[, subdivision ](h)." (*Yanowitz v. L'Oreal USA, Inc*, *supra*, 36 Cal.4th at pp. 1054-1055, fn. omitted.) "Actions that threaten to derail an employee's career are objectively adverse" and can constitute adverse employment action. (*Id.* at p. 1060; see *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 374 [where police lieutenant was removed from a "position near the top of the department's chain of command," and then from all "law enforcement duties, the objective terms and conditions of employment

18

have been adversely affected" and constituted "actionable adverse employment action."].)

The trial court instructed the jury on the element of an adverse employment action from BAJI No. 12.10 as follows:

"The term 'adverse employment action' means action by the employer and/or by the supervising employee that causes a substantial and material adverse effect on the terms, conditions or privileges of the plaintiff's employment. In determining whether a plaintiff has been subjected to an adverse employment action, you should consider the totality of the circumstances, including, but not limited to, the unique circumstances of the affected plaintiff as well as the workplace context of the claim. In addition, when there is more than one alleged act of retaliation, you should consider the proven acts of retaliation collectively in determining whether there has been an adverse employment action or actions.

"The significance of particular types of adverse actions must be evaluated by taking into account the legitimate interests of both the employer and the employee. Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment. However, adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement [does] materially affect the terms, conditions or privileges of employment.

"A plaintiff's refusal to follow a supervisor's order that he or she reasonably and in good faith believes to be discriminatory constitutes protected activity under the FEHA. An employer may not retaliate against a plaintiff on that basis when the employer, in light of all the circumstances, knows that the plaintiff believes the order to be discriminatory, even when the plaintiff does not explicitly state to his or her supervisor or employer that he or she believes the order to be discriminatory."

19

Contrary to the City's argument, this instruction, which closely follows the language of *Yanowitz*, accurately states the law regarding adverse employment action and adequately explains what kinds of treatment may and may not constitute adverse employment action. The instruction correctly states that an adverse employment action must cause "a substantial and material adverse effect on the terms, conditions or privileges of the plaintiff's employment," and must be "reasonably likely to impair a reasonable employee's job performance or prospects for advancement." It also explains, consistent with the City's theory, that "[m]inor or relatively trivial adverse actions or conduct" that is "reasonably likely to do no more than anger or upset an employee" is not adverse employment action.

The City complains that the trial court erred by refusing to give the City's proposed instructions on adverse employment action, the City's special instruction Nos. 1 and 3. The City's proposed special instruction No. 1 stated:

"In order to establish discrimination or retaliation, plaintiff must prove that he was subjected to an 'adverse employment action.' To qualify as an adverse employment action, an employment action by the employer must materially affect the terms, conditions, or privileges of employment. That is, the action must be reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion. Although 'adverse employment action' is not limited to ultimate actions such as termination or demotion, minor or trivial actions or conduct that are reasonably likely to do no more than anger or upset an employee cannot constitute adverse employment action. For example, mere offensive utterance or even a pattern of social slights by either the employer or co-employees cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment."

This proposed instruction was very similar to the instruction that the trial court gave. With the exceptions of the references to offensive utterances and social slights, it is virtually identical. The trial court did not err in refusing to give this duplicative instruction. (See *Harris v. Oaks Shopping* Center (1999) 70 Cal.App.4th 206, 209 ["trial

20

court is not required to give every instruction offered"]; *Linden Partners v. Wilshire Linden Associates* (1998) 62 Cal.App.4th 508, 528 [trial court does not err by refusing to give duplicative proposed special instructions]; *Anaheim Bldrs. Supply, Inc. v. Lincoln Nat. Life Ins. Co.* (1965) 233 Cal.App.2d 400, 413 ["[t]here is no requirement that a trial court must duplicate instructions"].)

Both sides had prepared special instructions on the issue of whether a lateral transfer of an employee is an adverse employment action. Counsel for Bakotich, Fanning, and Guerrero stated at a hearing on the jury instructions that if the court gave BAJI No. 12.10, then there was no need for the court to give either side's special instruction on lateral transfer. Counsel for the detectives stated that even the special instruction he submitted on the issue of lateral transfer was unnecessary because the language of BAJI No. 12.10 covered "trivial" adverse actions. The court refused both sides' lateral transfer instructions, plaintiffs' proposed instruction No. 7 and the City's proposed instruction No. 3, stating that they were not needed.

The City's proposed special instruction No. 3 stated:

"A transfer does not constitute an adverse employment action where the transfer is into a lateral position with comparable pay, benefits, and opportunities for promotion. An employee's personal feelings about an assignment, preferences for one assignment over another, or even personal feeling of humiliation as the result of a lateral transfer is insufficient to make the transfer constitute an adverse employment action."

We agree with the trial court that BAJI No. 12.10 adequately covered the issue of adverse employment action, and that the City's proposed special instruction No. 3 (and, for that matter, the plaintiffs' proposed special instruction No. 7) was unnecessary. (See *Arato v. Avedon*, *supra*, 5 Cal.4th at p. 1189, fn. 11; *Alamo v. Practice Management Information Corp.*, *supra*, 219 Cal.App.4th at p. 475; *Bell v. H.F. Cox, Inc.*, *supra*, 209 Cal.App.4th at p. 80.) Both sides were free to argue that under BAJI No. 12.10 and the court's other instructions that the transfers of Bakotich, Fanning, and Guerrero were not adverse employment actions because they were minor or trivial actions or conduct that were reasonably likely to do no more than anger or upset them.

21

Moreover, it is not necessarily true, as the City's proposed special instruction No. 3 stated, that "[a] transfer does not constitute an adverse employment action where the transfer is into a lateral position with comparable pay, benefits, and opportunities for promotion." The cases cited by the City, *McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377 and *Malais v. Los Angeles City Fire Dept.* (2007) 150 Cal.App.4th 350, do not hold that this is the rule in California. "A transfer can be an adverse employment action when it results in substantial and tangible harm." (*McRae*, *supra*, at p. 393; see *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1389 [transfer of principal from one school to another was an adverse employment action where the transfer "could be viewed unfavorably" and "in reality was a demotion," and the new school did "not present the kinds of administrative challenges an up-and-coming principal wanting to make her mark would relish" and "presented [a] different world[] for a principal"]; *Abboub v. International Business Machines Corp.* (N.D.Cal. 2006) 2006 WL 905319 at p. 6 [lateral transfer with same title, salary, and responsibilities was adverse employment action where the plaintiff's duties were "'substantially different'"].) The transfer in *McRae* was not an adverse employment action because the transfer "did not entail a demotion, reduction in pay or a loss of benefits," *and* "did not involve a change in status or less distinguished title," *and* there was "no evidence that it involved any significant change in responsibilities." (*McRae*, *supra*, at p. 393.)[15] The City did not ask for an instruction that included these factors. Indeed, "the determination of what type of adverse treatment properly should be considered discrimination in the terms, conditions, or privileges of employment is not, by its nature, susceptible to a mathematically precise test, and the significance of particular types of adverse actions must be evaluated by taking into account the legitimate interests

[15]    Similarly, *Malais* did not involve a loss of promotional or overtime opportunity. (*Malais v. Los Angeles City Fire Dept.*, *supra*, 150 Cal.App.4th at p. 358.) The plaintiff's only claim in *Malais* was that he preferred to work as a firefighter in the field rather than in the office. (*Id.* at pp. 355, 358.)

of both the employer and the employee." (*Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at p. 1054.) The instruction the trial court gave was a correct and nonargumentative statement of the law that allowed each side to argue whether, in light of the "realities of the workplace" in the Department (*ibid.*), the facts at trial supported or did not support a finding of adverse employment action. The trial court did not err in refusing the City's proposed instructions.

C. *Substantial Evidence Supports the Verdict for Past and Future Lost Earnings*

As noted above, the jury awarded Bakotich $502,523, which consisted of $2,523 in past economic damages for lost overtime, $50,000 in future economic damages, $225,000 in past non-economic damages, and $225,000 in future non-economic damages. The jury awarded Fanning $880,000, which consisted of $20,000 in past economic damages for lost overtime, $360,000 in future economic damages, $250,000 in past non-economic damages, and $250,000 in future non-economic damages. And the jury awarded Guerrero $1,085,800, which consisted of $5,800 in past economic damages for lost overtime, $580,000 in future economic damages, $250,000 in past non-economic damages, and $250,000 in future non-economic damages. On appeal, the City does not challenge the awards for past economic damages for lost overtime,[16] past non-economic damages, or future non-economic damages. Nor does the City challenge the amounts of

---

[16] The City mentions for the first time in its reply brief "[t]o the extent Bakotich's past damages were awarded for overtime, the assumption that Bakotich would have earned overtime is too speculative to reach the 'reasonably certain' standard necessary to award damages." The City in its reply brief makes a similar belated, three-sentence argument about Fanning's lost overtime damages. We decline to address these issues, raised for the first time on reply. (See *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 ["[o]bvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant"]; *Estate of Bonzi* (2013) 216 Cal.App.4th 1085, 1106, fn. 6 ["we do not consider arguments raised for the first time in a reply brief"].)

23

the awards for future economic damages to Bakotich, Fanning, and Guerrero, or any of the calculations by their forensic economist, Karen Smith. The City's only argument is that there is no substantial evidence to support the awards of future economic damages to the three detectives in any amount.

The City argues that the Department's discriminatory actions did not have any effect on Fanning and Guerrero's "pay, work benefits, and retirement benefits," that they "sought and obtained an equivalent Detective position" (RACER and then Hollenbeck for Fanning, Hollenbeck for Guerrero), and that no one at the Department "in any way interfered with [their] ability to promote, obtain a transfer, or to remain an LAPD Detective III in good standing for as long as [they] wished." Without challenging Karen Smith's economics or mathematics, the City argues that her calculations were based on the assumptions that Fanning and Guerrero would have retired later than they did, and that these assumptions were false because the decisions by Fanning and Guerrero to entire the DROP retirement program early were theirs and theirs "alone."

The evidence showed that Fanning and Guerrero did indeed decide to enter the DROP retirement program early, but to say that they made these decisions "alone" ignores the circumstances that led to their decisions and their explanations of why they made their decisions. Fanning explained that the officers involved in the events that led to his benching destroyed his reputation, his ability to return to a specialized unit like the Fugitive Warrants Section, and his desire to work longer at the Department. Fanning stated that the officers who orchestrated and approved the discrimination are now commanders and are the same "people who decide the promotions." He explained that because he was disciplined and "ripped out of a division" and a specialized unit for something he did not do, his prospects in the Department were ruined. He stated, "My reputation is gone and they're questioning my integrity, my professionalism and on this job without integrity, you're nothing."

Guerrero explained that the incidents in the Fugitive Warrants Section with Cortez damaged her reputation and raised a question about her integrity, causing her to change her retirement plans. Guerrero went "from positions of prestige" and "great [and]

24

coveted assignments," to a position back at "the starting block for a detective." Guerrero also explained that the people making promotion decisions in the Department look at an officer's past work history and whether it has been consistent, and that going back to "the starting block for a detective" as Guerrero had done hurt her opportunity for promotion. Moreover, Guerrero could not apply for a Detective III position doing narcotics work because McCarthy, now a Commander, supervises those detectives, and "that obviously is not going to be an option for [her]." It was for these reasons that she decided to enter the DROP program earlier than she had planned.

Whether Fanning and Guerrero decided to retire early because they experienced discrimination at the hands of Cortez and McCarthy, or whether they did so for other reasons, was a factual question for the jury. (See *Smith v. Alum Rock Union Elementary School Dist.* (1992) 6 Cal.App.4th 1651, 1657, fn. 2 ["[w]hether plaintiff was involuntarily retired is a question of fact"]; *Blevins v. Cessna Aircraft Co.* (10th Cir. 1984) 728 F.2d 1576, 1582 ["the issue of lost wages and voluntary retirement was properly one for the jury"]; *Seisser v. Platz Flowers & Supply, Inc.* (N.D.Ill. 2000) 129 F.Supp.2d 1130, 1135 [whether employee retired voluntarily is an issue of fact].) Similarly, whether the assumptions by Karen Smith on which her unchallenged damages calculation rested were reasonable was also a question for the jury. (See *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 489-490.) The jury believed Fanning and Guerrero and found that they decided to retire (or, more specifically, enter the DROP program) early because of the Department's discrimination and retaliation against them, and the jury credited Karen Smith's unrebutted damages testimony. The jury's findings are supported by substantial evidence.

Unlike Fanning and Guerrero, Bakotich's claim for future economic damages did not involve early retirement or calculations by the forensic economist. Instead, Bakotich's claim for future economic damages was based on his failure to obtain the teaching position at Rio Hondo College, which he said would have paid $50,000 to $77,000. The City argues that there was no evidence that Bakotich was reasonably likely to "obtain any desired employment after retirement from [the Department]," that there

25

was "no evidence that anyone from [the Department] interfered in any way with the prospective Rio Hondo position," and that there was "no evidence that Bakotich was even close to being hired for that position anyway."

We agree with the City that there is no substantial evidence to support the jury's $50,000 award for Bakotich's loss of this future employment opportunity. Bakotich's claim for the lost teaching position consisted of little more than speculation and surmise that (1) he lost a job he could have had, and (2) the Department had something to do with it. According to Bakotich, the retired police captain who interviewed Bakotich for the teaching position "may have been told of [Bakotich's benching] and perhaps he has a negative opinion of what has occurred. Maybe he wasn't told even accurate information and as a result, my phone is not ringing. My calls aren't being returned." Bakotich, however, never received any information from this potential employer that it had received any negative comments from the Department about him. Nor was Bakotich aware that any prospective employer from whom he sought employment ever received any negative information about him from the Department. At trial, Bakotich still did not know what his status was with respect to the Rio Hondo teaching job, and he did not know if the school was still interviewing. Bakotich did not know whether the school even hired anyone to teach the classes that he had wanted to teach. The absence of return phone calls is not substantial evidence that Bakotich lost the job because of anything the Department did or did not do. Because there was no evidence that Bakotich was reasonably likely to get the job, or that anyone at the Department knew that Bakotich was applying for the job and took some kind of step to interfere with Bakotich's efforts to get it, there was no substantial evidence to support this damages claim. (Cf. *Sanchez v. County of San Bernardino* (2009) 176 Cal.App.4th 516, 530 [former employee entitled to sue former employer for loss of employment opportunity where potential employer stated it was aware of the situation with her former employer and that it was "'definitely a factor'" in its decision not to hire her].)

26

## DISPOSITION

The judgment is modified to reflect an award of $1,085,800 in damages to Guerrero. The award of $50,000 in future economic damages to Bakotich is reversed. In all other respects, the judgment as modified is affirmed. Bakotich, Fanning, and Guerrero are to recover their costs.

SEGAL, J.[*]

We concur:

WOODS, Acting P. J.

ZELON, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.